IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEIYERVER ADRIÁN LEON RENGEL

Plaintiff,

v.

Case No.  1:26-cv-01008

UNITED STATES OF AMERICA

Defendant.

COMPLAINT

INTRODUCTION

1. Approximately one year ago, officers of the United States disregarded the Constitution, abused their authority under law, and flouted the federal judiciary in order to effectuate the Trump Administration's (the "Administration") illegitimate goals of punishing Venezuelan immigrants and broadly intimidating non-citizens from pursuing legal avenues to immigration through the targeted persecution of Venezuelan immigrants. Through a series of unconstitutional and ultra vires acts by high ranking federal officials and law enforcement officers, Plaintiff Neiyerver Adrián Leon Rengel was wrongly identified as a member of the gang Tren de Aragua ("TdA"), repeatedly denied due process, falsely imprisoned, intentionally deceived, and—ultimately—illegally sent to El Salvador in blatant violation of a court order. In El Salvador, a country far from Plaintiff's country of origin of Venezuela, and far from his home in the United States, he spent four months in prison, the Terrorism Confinement Center ("CECOT"), where Salvadoran officials subjected him to physical and psychological abuse, humiliation, and degradation. This all occurred while the United States retained constructive custody over Plaintiff.

1

2.      Plaintiff is a Venezuelan national who entered the United States several years ago seeking to do everything by the book. Plaintiff entered at a port of entry, complied with immigration law requirements, and was awaiting a hearing before an immigration judge set for 2028.

3.      On the morning of his birthday, March 13, 2025, while he was headed to work, Plaintiff was caught in the Administration's scheme and would soon experience the full force of its unconstitutional and unlawful policies.

4.      When officers of U.S. Immigration and Customs Enforcement ("ICE") initially detained Plaintiff, they ignored Plaintiff's documentation that confirmed his ongoing immigration court case and showed he had a pending application for Temporary Protected Status. At the time of his arrest, the only justification offered by ICE officers was that Plaintiff's tattoos indicated his membership in TdA. Plaintiff immediately rebutted that identification, as he has never had any affiliation with TdA or any other gang.

5.      Plaintiff's full story illustrates the myriad ways that federal officials and law enforcement officers' premeditated, unconstitutional, and ultra vires policies and actions tortiously injured him. Plaintiff was denied due process again and again—he was refused requests to contact his family or see a judge; he was given shifting, false explanations for why he was being detained and what would happen to him; he was recklessly misidentified as a gang member; he had no meaningful opportunity to rebut the false allegations made against him.

6.      Plaintiff was awoken in the early hours of the morning on March 15, 2025 and misled into thinking he was being sent to his country of origin, while in reality he was taken aboard a GlobalX plane headed to El Salvador.

7.      Upon arriving in El Salvador and realizing that he was in fact in a foreign land, Plaintiff was forced to watch his fellow detainees abused aboard the plane before being thrown down the airplane steps, knowing that he too would imminently face similar abuse.

8.      From Washington D.C., the Administration mocked his predicament: U.S. Secretary of State Marco Rubio retweeted a post by El Salvador 's President commenting on a news headline reporting the court's order that detainees be returned to the United States: "Oopsie . . . Too late 😂." Marco Rubio (@marcorubio), X (Mar. 16, 2025, at 7:46 a.m. ET).[1])).

9.      For four months, Plaintiff languished in CECOT, during which time he was beaten by guards, subjected to inhumane and overcrowded conditions as well as extreme psychological trauma, denied adequate medical care, and held without contact with his family or any legal counsel. Meanwhile, U.S. Secretary of Homeland Security Kristi Noem made light of the horrific conditions of confinement at CECOT by traveling to El Salvador for photo opportunities at CECOT, adding to Plaintiff's humiliation. *See, e.g.*, U.S. Dep't of Homeland Sec., *DHS Secretary Kristi Noem Travels to El Salvador (019)* (Mar. 26, 2025).[2]

10.     Starting with Plaintiff's initial, sudden detention, his family repeatedly sought information about him from U.S. government officials. They were provided inconsistent and inaccurate information, finally learning that he had been removed to El Salvador over a month later. It was not until June that they received confirmation of his imprisonment in CECOT, after Plaintiff had already endured extensive physical and psychological harm.

---

[1] *Available at* https://perma.cc/6VTW-5KRD (retweeting Nayib Bukele (@nayibbukele)). Links to sources available on the Internet are hereinafter provided in footnotes, for the sake of readability.
[2] *Available at* https://www.dhs.gov/medialibrary/assets/photo/59679.

11.     All of this took place despite the Administration's "constructive custody" over Plaintiff for the entirety of the relevant period, including during his confinement in CECOT. *J.G.G. v. Trump,* No. 1:25-cv-00766-JEB, 2025 WL 3706685, at *7-11 (D.D.C. Dec. 22, 2025).

12.     Plaintiff's story is not one of a normal, lawful immigration enforcement action. Instead, the "cruel, heartless way" that the Trump Administration's scheme was effectuated, including upon Plaintiff, is "conscience-shocking." *See D.A. v. United States*, 663 F. Supp. 3d 715, 735 (W.D. Tex. 2023).

13.     Part of the Administration's scheme was the implementation of a "long-dormant wartime statute—the Alien Enemies Act of 1798 [the "AEA"], invoked only three times in our nation's history—to summarily remove hundreds of people from immigration detention in the United States to indefinite confinement in a prison in El Salvador" in March 2025. *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *1 (D.C. Cir. Nov. 14, 2025); *see also* Alien Enemies Act, 50 U.S.C. §§ 21-24.[3]

14.     For over a year, during the 2024 campaign, then-candidate Donald J. Trump clearly expressed his ire toward Venezuelan immigrants, making outlandish claims about them, calling them "criminals," and worse. His campaign and future members of his Administration—including Kristi Noem (subsequently appointed to lead the Department of Homeland Security ("DHS")), Marco Rubio (now Secretary of State), and top advisor and current White House official Stephen Miller—repeatedly doubled down on that rhetoric. As a candidate, President Trump's plan to expel

---

[3] The Supreme Court has stated that "detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal." *Trump v. J. G. G.*, 604 U.S. 670, 673, (2025) (per curiam). It held in mid-May that for individuals subject to the AEA, "notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025) (per curiam). As demonstrated throughout the Complaint, the AEA, as implemented upon Plaintiff, did not provide him with adequate due process.

Venezuelan nationals from the United States had crystalized no later than October 12, 2024 when he said "we have to live with these animals, but we're not going to live with them for long, you watch." FOX 4 Dallas-Fort Worth, *Trump Rally in Aurora, Colorado: FULL SPEECH*, at 41:56 (YouTube, Oct. 12, 2024).[4]

15.    To effectuate that plan, the Administration deliberately sought to operate outside of existing immigration law and the constraints of due process, using the AEA as a primary vehicle to do so. Such unlawful intent was clear from the beginning, underscored by acts such as: (i) the public statements of administration officials that signaled their plans to use the AEA to deny due process; (ii) an agreement with the President of El Salvador, Nayib Bukele, to imprison Venezuelans in CECOT's notoriously inhumane conditions; (iii) the Administration's initial issuance of the Presidential Proclamation that invoked the AEA (the "Proclamation") in secret; (iv) the ensuing scramble by federal officials to get planes from their contracted aviation company, Global Crossing Airlines ("GlobalX"), in the air once that Proclamation was made public in order to avoid judicial review; (v) the subsequent violation of a court order to effectuate removals; and (vi) the actions taken by members of the Administration and President Bukele to keep Plaintiff and similarly situated men imprisoned long after their removal was deemed unlawful by the federal courts.

16.    In short, whether or not invocation of the AEA was lawful, the Administration designed and implemented unlawful enforcement mechanisms in order to accelerate the wrongful detention and removal of Venezuelan immigrants like Plaintiff based on their national origin, to systematically deny that class of people due process and judicial review, and—ultimately—to broadcast a narrative of maximum punishment through its unprecedented arrangement with El

---

[4] *Available at* https://www.youtube.com/watch?v=_xguaneoZ5A.

Salvador. Indeed, as one comprehensive press account put it, "[t]he prospect of the U.S. sending migrants to a foreign prison notorious for alleged human-rights violations would have been unimaginable less than a year ago." Eric Cortellessa & Brian Bennett, *Inside Donald Trump's Mass-Deportation Operation*, Time (June 10, 2025).[5]

17.     The mere deportation of Plaintiff and Venezuelans generally was not the Administration's sole objective; nor was it solely the Administration's intent to openly circumvent legal protections so as to inflict physical harm and humiliation on Venezuelan immigrants. Instead, the Administration also sought to punish the entire population of Venezuelans currently pursuing immigration in the United States (without doing so against similarly situated aliens), and to deter other non-citizens from pursuing legitimate immigration claims in the United States.

18.     Underscoring this intent was a premeditated agreement by senior federal officials to defy federal courts. Both in public and in private, these high-ranking officials instructed subordinates that, in the event of a court order preventing them from carrying out deportations, subordinates may be required to defy such orders. During a March 14, 2025 Department of Justice ("DOJ") meeting, DOJ lawyers were informed by then-Principal Assistant Deputy Attorney General Emil Bove of a potential "f - - - you" strategy of ignoring the inevitable court orders that would enjoin the Administration's unlawful use of the AEA. Letter from Gov't Accountability Project, to Michael E. Horowitz, Inspector General, U.S. Dep't of Justice, *Protected Whistleblower Disclosure of Erez Reuveni Regarding Violation of Laws, Rules & Regulations, Abuse of Authority, and Substantial and Specific Danger to Health and Safety at the Department of Justice* (redacted), at 7 (June 24, 2025).[6]

---

[5] *Available at* https://time.com/7291757/trump-deportation-ice-el-salvador/?utm_source.
[6] *Available at* https://www.judiciary.senate.gov/imo/media/doc/06-24-2025_-_Protected_Whistleblower_Disclosure_of_Erez_Reuveni_Redacted.pdf?utm_source.

19. Plaintiff brings claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, for injuries arising from several negligent and intentional tortious acts and omissions, including that of: (i) federal officials who effectuated the Proclamation invoking the AEA in Washington, D.C., including to systematically deny due process to Plaintiff; (ii) federal officials in Washington, D.C., involved in providing directives to defy direct court orders and carrying out the Administration's unlawful scheme as to Plaintiff; and (iii) ICE and other law enforcement officers who implemented those unlawful policies against Plaintiff.

20. As a direct and proximate result of the negligent, wrongful, and unlawful acts and omissions of federal officials and law enforcement officers acting within the scope of their employment, Plaintiff suffered loss of liberty, physical injury, severe emotional distress, and lasting psychological trauma.

21. Plaintiff has exhausted his administrative remedies as required by law.

22. Plaintiff brings this action to hold the United States accountable for the injuries caused by its agents' conduct and seeks at least $1,300,000 in damages under the FTCA.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1).

24. On July 24, 2025, Plaintiff submitted a Claim Authorization Form, Standard Form 95 and Attachment to Standard Form 95. *See* Exhibit A. More than six months have elapsed without final disposition of that claim. Accordingly, Plaintiff has exhausted all potential administrative remedies pursuant to 28 U.S. § 2675(a).

25.     Venue is proper under 28 U.S.C. § 1402(b) because a substantial part of the acts or omissions giving rise to the claims herein occurred in the District of Columbia.

## PARTIES

26.     Plaintiff is from Caracas, Venezuela. On June 12, 2023, he entered the United States at the Paso Del Norte port of entry in El Paso, Texas, after appearing for a pre-scheduled CBP One appointment where he underwent screenings and provided his biometrics. Plaintiff was then released and scheduled to appear for a master hearing on April 4, 2028 before Immigration JudgeJudge Attila Bogdan. According to the relevant federal government website, Plaintiff's immigration case is still pending. *See* Exhibit B (accessed March 24, 2026). Plaintiff also applied for Temporary Protected Status in December 2024, the application for which was still being processed for approval at the time of his detention.

27.     Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680. It is sued in its capacity as the employer of the federal officials of DHS, DOJ, the Department of State ("State Department"), and the White House who are described below.

## STATEMENT OF FACTS

**A. The Government's Immigration Enforcement Campaign was Unconstitutionally Designed to Punish Venezuelan Nationals and Instill Fear in Non-Citizens to Deter Lawful Immigration.**

28.     In December 2023, while a candidate for President of the United States, President Donald J. Trump articulated the premise that would soon come to define his campaign and the early stages of his second term: immigrants were "poisoning the blood" of our country. Hannah

Fingerhut & Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood atIowa rally*, Associated Press (Dec. 19, 2023).[7]

29.      A few months later, President Trump explained that he was not sure "if you [can] call [illegal immigrants] people. In some cases, they're not people." Marisa Iati, *Trump says some undocumented immigrants are "not people"*, Wash. Post (Mar. 16, 2024).[8]

30.      In July 2024, during his Republican Convention Speech as candidate for President of the United States, President Trump claimed that immigrants coming to the United States from Latin American countries constituted "the greatest invasion in history." Gianfranco Beran, *Trump claims "greatest invasion in history" happening at southern border*, PBS Newshour Classroom (July 19, 2024).[9]

31.      President Trump further claimed that presidential nominee Kamala Harris "wants to . . . releas[e] vicious monsters into our communities to rape, maim and murder our population" and that if "[she] wins, a never ending stream of illegal alien, rapists, [] animals and child predators will ravage your communities." *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants*, Marshall Project (Oct. 21, 2024).[10]

32.      On the campaign trail, President Trump singled out Venezuelan immigrants hundreds of times, repeatedly asserting that Venezuela had "dumped hundreds of thousands of people into our country from prisons" or that "[Venezuela] took all of their criminals" their "gang members [and] they're dropping them all into our country." *Id*. For example, an analysis of 109 of

---

[7] *Available at* https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[8] *Available at* https://www.washingtonpost.com/politics/2024/03/16/trump-immigrants-not-people/.

[9] *Available at* https://www.pbs.org/newshour/classroom/daily-news-lessons/2024/07/trump-claims-greatest-invasion-in-history-happening-at-southern-border?utm.

[10] *Available at* https://www.themarshallproject.org/2024/10/21/fact-check-12000-trump-statements-immigrants.

President Trump's speeches, debates, and interviews found that he called Venezuelan migrants "criminals" seventy times in the period between September 1, 2023 to October 2, 2024. Russell Contreras, Delano Massey & Erin Davis, *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024).[11] And this is just a mere sampling of President Trump's statements demonstrating animus towards Venezuelan immigrants specifically. *See e.g.*, Marshall Project, *supra* para. 31.

33.     President Trump's animus towards Venezuelan immigrants was echoed by prominent campaign surrogates, some of whom went on to hold prominent roles in the new Administration.

34.     For instance, Secretary Noem routinely vilified the Venezuelan population in the United States with statements such as "[c]ountries like Venezuela are emptying their prisons, their mental institutions, and sending them to America." Kristi Noem (@KristiNoem), X (Mar. 6, 2024, at 5:01 CT).[12] She also explained that "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America. Deportations need to start on DAY ONE of [President Trump's] term." Kristi Noem (@KristiNoem), X (Feb. 27, 2024, at 7:26 CT).[13] And these are just the tip of the iceberg.[14]

---

[11] *Available at* https://www.axios.com/2024/10/05/trump-migrants-venezuelan-congolese-rhetoric.

[12] *Available at* https://x.com/KristiNoem/status/1765513039795601862.

[13] *Available at* https://x.com/KristiNoem/status/1762650522920652828.

[14] There are myriad examples of Secretary Noem's derogatory statements about Venezuelans. For a sample, *see, e.g.,* Kristi Noem (@KristiNoem), X (Feb. 26, 2024, at 1:19 CT), https://x.com/KristiNoem/status/1762195636491825295 ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America. They are happy to let America's open border be the solution to their problem."); Kristi Noem (@KristiNoem), X (Feb. 27, 2024, at 5:26), https://x.com/KristiNoem/status/1762650522920652828 ("Venezuela didn't send us their best. They emptied their prisons and sent criminals to America."); Kristi Noem (@KristiNoem), Instagram (Mar. 6, 2024), https://www.instagram.com/kristinoem/reel/C4ML17eRBYr/ ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America. The White House is facilitating this invasion. They're doing it on purpose."); Kristi

35.     In August 2024, Secretary Rubio echoed President Trump and Secretary Noem's baseless comments, stating that "[former Venezuelan President Nicolás Maduro] will also happily send dangerous criminals" to the United States. Emilie Sweigart, *What Marco Rubio Has Said About Latin America*, Americas Quarterly (Nov. 12, 2024).[15]

36.     And in October 2024, President Trump escalated his rhetoric, claiming that Venezuelan immigrants had turned certain United States cities into "war zone[s]" overrun by "arm[ies] of illegal alien gang members and migrant criminals from the dungeons of the third world." Bente Birkeland, *Trump rallies in Aurora — a city he has demonized as overrun by migrant crime*, NPR (Oct. 11, 2024).[16]

37.     Just days later, President Trump explained that "[e]veryday Americans . . . are living in fear all because Kamala Harris decided to empty the slums and prison cells of [] [Venezuela] and many other places . . . . [A]nd we have to live with these animals, but we're not going to live with them for long, you watch." FOX 4 Dallas-Fort Worth, *supra* para. 14, at 41:00-42:00.

38.     President Trump and members of his Administration had made clear their ire for immigration in general on the campaign trail. However, equally clear was that Venezuelan immigrants specifically would soon face harsh, targeted treatment to which other non-citizen populations living in the United States would not be subjected, purely on the basis of their national

---

Noem   (@KristiNoem),   X   (Mar.   14,   2024,   at   11:24   CT), https://x.com/KristiNoem/status/1768312288560247199 ("At least 300,000 illegal immigrants from Venezuela have been encountered at the border. Remember, Venezuela emptied their prisons and told them to come to America."); Kristi Noem (@KristiNoem), Instagram (Dec. 8, 2024), https://www.instagram.com/kristinoem/reel/DDVjJnURRqw/ ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

[15] *Available at* https://americasquarterly.org/article/what-marco-rubio-has-said-about-latin-america/.

[16] *Available at* https://www.npr.org/2024/10/11/nx-s1-5147400/donald-trump-aurora-colorado-rally.

origin. Ultimately, the Administration would target Venezuelan immigrants writ large, regardless of immigration status, occupation, gang affiliation, or other factors.

39.    President Trump and his Administration's goal of punishing Venezuelans on the basis of their nationality is supported by the fact that none of President Trump's assertions had any basis in reality: "[t]here is no evidence that the Venezuelan government is systematically or selectively releasing prisoners and expelling them from the country." Jorge Valencia, *Trump Says Venezuela Sends Criminals to the U.S. Here's What to Know*, N.Y. Times (July 31, 2024) (describing the lack of any evidence for the assertion that Venezuela is emptying prisons and expelling prisoners to the United States, and considering it "highly unlikely").[17]

40.    In order to effectuate his discriminatory rhetoric and deliver on his promise to rid the United States of Venezuelan "animals," *see* FOX 4 Dallas-Fort Worth, *supra* para. 14*, President Trump specifically and repeatedly vowed to "invoke the Alien Enemies Act of 1798 to target and dismantle every migrant criminal network operating on American soil," even though this wartime statute had long lain dormant. Rachel Treisman, *Trump is promising deportations under the Alien Enemies Act of 1798. What is it?*, NPR (Oct. 19, 2024).[18]

41.    As the *New York Times* would later report, Homeland Security Advisor and White House Deputy Chief of Staff for Policy "[Stephen] Miller had long been interested in the Alien Enemies Act, a law passed in 1798 that allows the U.S. government to swiftly deport citizens of an invading nation, [which] he saw as a powerful weapon to apply to immigration enforcement." Zolan Kanno-Youngs, et al., *Behind Trump's Deal to Deport Venezuelans to El Salvador's Most*

---

[17] *Available at* https://www.nytimes.com/2024/07/31/world/americas/trump-crime-venezuela-us.html.
[18] *Available at* https://www.npr.org/2024/10/19/nx-s1-5156027/alien-enemies-act-1798-trump-immigration.

*Feared Prison*, N.Y. Times (Apr. 30, 2025).[19] Specifically, Miller argued that the AEA would "allow[] [the Administration] to instantaneously remove any noncitizen foreigner from an invading country, aged 14 or older" and "suspend the due process that normally applies to a removal proceeding." *Id*.

42.    President Trump himself recognized that these plans, which relied upon the disregard of due process protections, would inevitably result in misidentification and unlawful deportations that would subject persons to injury. "You put one wrong person onto a bus or onto an airplane and your radical left lunatics will try and make it sound like it's the worst thing that's ever happened," President Trump stated in September 2024, "But we're getting the criminals out. And we're going to do that fast." Elliot Spagat, *Trump's goal of mass deportations fell short. But he has new plans for a second term*, Associated Press (Sep. 22, 2024).[20]

43.    Supported by senior Administration officials espousing similar exaggerated claims about violent Venezuelan criminal immigrants wreaking havoc on the United States, and armed with Stephen Miller's argument that the AEA would automatically "suspend" the due process normally applicable to any removal proceeding, President Trump immediately laid the groundwork to target Venezuelans and send a broader political message upon taking office.

44.    On his first day, President Trump signed Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, which directed the Secretary of State to designate certain criminal organizations with ties to Venezuela as "foreign terrorist organizations." Exec. Order No. 14157, 90 Fed. Reg. 8439 (Jan. 20, 2025).

---

[19] *Available at* https://www.nytimes.com/2025/04/30/us/politics/trump-deportations-venezuela-el-salvador.html.
[20] *Available at* https://www.ap.org/news-highlights/elections/2024/trumps-goal-of-mass-deportations-fell-short-but-he-has-new-plans-for-a-second-term/.

45.    On the same day, President Trump also signed Executive Order 14159, *Protecting the American People from Foreign Invasion,* which called for action related to interior immigration enforcement, expedited removal and detention. *Protecting the American People Against Invasion,* Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

46.    Both Executive Orders relied not only on a novel application of terrorism designations, which are usually reserved for state-sponsored or ideologically-motivated actors, but also on the same suspect legal grounds and unlawful animus that would later underlie the Trump Administration's unlawful scheme against Plaintiff.

47.    On January 29, 2025, the Administration's plan to punish Venezuelan immigrants and dissuade them from legal immigration avenues came into clear view when its inflammatory rhetoric, executive orders, and proliferating immigration infrastructure culminated in the sudden revocation of Temporary Protected Status ("TPS") for hundreds of thousands of Venezuelan immigrants. Jasmine Garsd, *Trump ends extension of temporary protected status for hundreds of thousands of Venezuelan migrants*, NPR (Jan. 29, 2025).[21]

48.    Now, hundreds of thousands of Venezuelans would face the loss of work authorizations, driver's licenses, and an immigration status that offered them some measure of protection from removal. Maria Constanza Costa, *What Does the End of TPS Mean for Venezuelans in the United States?*, Nonprofit Quarterly (Feb. 4, 2026).[22] Later, under the Administration's plans to disregard due process protections for Venezuelans, any such individual

---

[21] *Available at* https://www.npr.org/2025/01/29/nx-s1-5279219/trump-ends-extension-of-temporary-protected-status-for-hundreds-of-thousands-of-venezuelan-migrants.
[22] *Available at* https://nonprofitquarterly.org/what-does-the-end-of-tps-mean-for-venezuelans-in-the-united-states/#:~:text=The%20consequences%20of%20this%20revocation,from%20schools%20and%20jobs%20interrupted.

14

subject to a removal proceeding would not be entitled to due process. *See* Kanno-Youngs, et al., *supra* para. 41*;* Stephen Miller (@StephenM), X (Apr. 1, 2025, at 12:04 CT).[23]

49.    While discussing the decision to end TPS for Venezuelans, Secretary Noem stated, "folks from Venezuela that have come into this country are members of TdA. And remember, Venezuela purposely emptied out their prisons, emptied out their mental health facilities and sent them to the United States of America." NBC News, *Meet the Press Full Broadcast — Feb. 2*, at 16:23 (YouTube, Feb. 2, 2025).[24] Crystallizing her point of view on Venezuelan immigrants more clearly, she explained that "[t]he people of this country want these [Venezuelan] dirtbags out." Interview with Kristi Noem, Sec'y of Homeland Sec., on *Fox & Friends* (Fox News television broadcast Jan. 29, 2025).[25]

50.    A month later, a federal judge in San Francisco found "evidence of discriminatory animus" against Venezuelans by Secretary Noem and "President Trump[,] and that his intent and actions bore a direct nexus to the actions taken by Secretary Noem [to revoke TPS]." *Nat'l TPS All. v. Noem*, 773 F.Supp.3d 807, 858 (N.D. Cal. 2025), *aff'd*, 150 F.4th 1000 (9th Cir. 2025).

51.    On appeal, a panel for the Ninth Circuit agreed that Secretary Noem's revocation of the TPS was unlawful. *Nat'l TPS All. v. Noem*, 166 F.4th 739 (9th Cir. 2026) (affirming district court and holding Secretary exceeded statutory authority under 8 U.S.C. § 1254a). In concurrence, Judge Salvador Mendoza Jr. concluded that "the agency's rushed and abnormal procedure, coupled with the Secretary's and President's bad faith statements of animus toward TPS holders who are Venezuelan . . . make clear that the official concerns cited by the Secretary were not the driving forces behind her actions." *Id* at 780 (Mendoza, J., concurring). Instead, "[t]he true impetus for the

---

[23] *Available at* https://x.com/StephenM/status/1907116768474071069
[24] *Available at* https://www.youtube.com/watch?v=FpeMXrvxHco.
[25] *Available at* https://www.instagram.com/reel/DFaf8JTxU-o/.

Secretary's actions was the illegitimate one of vacating TPS protections for disfavored groups that were stereotyped as criminals, mentally unwell, and gang members based on their country of origin." *Id.* at 780-81.

52.     By early February, it was reported that Secretary Rubio and President Bukele had brokered an agreement between El Salvador and the United States to incarcerate certain persons in its maximum-security Terrorism Confinement Center, known as "CECOT," on behalf of the United States. *See* Vanessa Buschschlüter & Nathan Williams, *El Salvador Offers to lock up U.S. Criminals in its mega-jail*, BBC News (Feb. 4, 2025).[26] Secretary Rubio struck this agreement despite credible reports of widespread human rights abuses, including "cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food" in Salvadoran Prisons. Juanita Goebertus, *Human Rights Watch declaration on prison conditions in El Salvador for the J.G.G. v. Trump case*, Hum. Rhts. Watch (Mar. 20, 2025);[27] Cristosal, *Silence Is Not an Option: Investigation Into the Practices of Torture, Death, and Failed Justice in the State of Emergency (El silencio no es opción: Investigación sobre las prácticas de tortura, muerte y justicia fallida en el régimen de excepción)* (2024).[28] Discussing El Salvador's prisons, the U.S. State Department stated in 2023 they "were harsh and life threatening." U.S. Dep't of State Bureau of Democracy, H.R. and Lab., 2023 Country Rep. on Hum. Rts. Practices: El Salvador (2023).[29] CECOT was built as the crown jewel of El Salvador's prison system, specifically as a place of permanent confinement: "We, as the Security Cabinet, will ensure that the penalties are high enough so that none of those who enter

---

[26] *Available at* https://www.bbc.com/news/articles/c0jn5291p52o.
[27] *Available at* https://www.hrw.org/news/2025/03/20/human-rights-watch-declaration-prison-conditions-el-salvador-jgg-v-trump-case.
[28] *Available at* https://cristosal.org/ES/presentacion-informe-el-silencio-no-es-opcion/.
[29] *Available at* https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/.

CECOT will ever leave walking; they will only be able to leave in a coffin." Press Release, Gustavo Villatoro, Minister of Justice and Public Security of El Salvador (Feb. 6, 2023).[30]

53.    Only days before the agreement was publicly reported, Secretary Rubio had given Secretary Noem his formal recommendation that she terminate TPS for the Venezuelan immigrant population living in the United States. Ivan Taylor, *Marco Rubio endorses ending TPS for Venezuelans, drawing outcry from advocates*, CBS News (Apr. 17, 2025).[31] Thus, in a span of days, Secretary Rubio had formally recommended ending the key legal protection insulating the immigrant Venezuelan population in the United States from removal, while also brokering a deal whereby members of that population could be sent to a prison that has been described as "hell on earth." Sergio Martínez-Beltrán & Manuel Rueda, *"Hell on Earth": Venezuelans deported to El Salvador mega-prison tell of brutal abuse*, NPR (July 27, 2025).[32] A prison that the Salvadoran government itself has described as reserved for "terrorists," which they "will never leave." Goebertus, *supra* para. 52.

54.    Weeks later, during a visit to CECOT, Secretary Noem stood in front of a jail cell and stated: "I . . . want everybody to know, if you come to our country illegally, this is one of the consequences you could face." Clarissa-Jan Lim, *Sec. Kristi Noem uses inmates of notorious Salvadoran prison in photo op*, MS NOW (Mar. 27, 2025).[33]

55.    Secretary Noem also argued that deportees "should stay there for the rest of their lives." Julie Turkewitz, et al., *"Alien Enemies" or Innocent Men? Inside Trump's Rushed Effort*

---

[30] *Available at* https://www.seguridad.gob.sv/como-gabinete-de-seguridad-nos-encargaremos-de-que-ninguno-de-los-que-entre-al-cecot-salga-caminando-nunca-ministro-gustavo-villatoro/.
[31] *Available at* https://www.cbsnews.com/miami/news/rubio-endorses-ending-tps-for-venezuelans-drawing-outcry-from-advocates/.
[32] *Available at* https://www.npr.org/2025/07/27/nx-s1-5479143/hell-on-earth-venezuelans-deported-to-el-salvador-mega-prison-tell-of-brutal-abuse.
[33] *Available at* https://www.msnbc.com/top-stories/latest/kristi-noem-el-salvador-prison-cecot-video-rcna19839.

*to Deport 238 Migrants*, N.Y. Times (Apr. 16, 2025), (quoting Secretary Noem).[34] President Bukele has previously concurred with this sentiment about CECOT, stating that its detainees would not "leave for any trial dates . . . They won''t have the opportunity to cause any more chaos." Eyder Peralta, *The triumph of the Bukele doctrine*, NPR (Mar. 23, 2025).[35] In a communication witnessed by Plaintiff, CECOT's director said each and every detainee would remain imprisoned there for at least ninety years.

56. Stephen Miller has, on multiple occasions made statements to the same effect, including that "[t]he right of 'due process' is to protect citizens from their government, not to protect foreign trespassers from removal" *see* Stephen Miller (@StephenM), X (May 5, 2025, at 8:02 CT),[36] and that the "only "process" afforded to a person who "illegally invaded our country" is "deportation." Stephen Miller (@StephenM), X (Apr. 1, 2025, at 12:04 CT).[37]

57. Senior U.S. officials thus used their bully pulpit to create a climate of hostility against Venezuelan immigrants before stripping them of the legal protections afforded under TPS and brokering a deal with a foreign state whereby Venezuelans could be imprisoned at CECOT. The Administration then used the threat of imprisonment in horrific conditions without due process as a means to scare Venezuelan nationals and deter immigration writ large.

58. Indeed, by late February 2025, ICE had begun utilizing GlobalX's planes to transport large numbers of Venezuelans to detention facilities from which they could be swiftly deported. This action, occurring weeks before invocation of the AEA, would help set up later Act-based removals. *See J.G.G. v. Trump,* No. 1:25-cv-00766, ECF No. 81 (D.D.C. Apr. 16, 2025)

---

[34] *Available at* https://www.nytimes.com/2025/04/15/world/americas/trump-migrants-deportations.html [https://perma.cc/KQ9T-6M2L].
[35] *Available at* https://www.npr.org/2025/03/23/nx-s1-5333240/the-triumph-of-the-bukele-doctrine.
[36] https://x.com/StephenM/status/1919377123266937140.
[37] https://x.com/StephenM/status/1907116768474071069.

(explaining that "[a]lthough the Proclamation was not published until 3:53 p.m. on Saturday [March 15, 2025] . . . Defendants had begun setting Act-based removals into motion weeks earlier."). Just weeks later, Venezuelan detainees would be hauled onto GlobalX planes in Harlingen, Texas, which would then proceed to El Salvador's CECOT in violation of a court order.

59.     On March 13, 2025, it was reported that President Trump planned to imminently invoke the AEA to circumvent normal immigration procedures and expedite the deportation of Venezuelan nationals. On the evening of Friday, March 14, 2025, President Trump signed a Presidential Proclamation to that effect, "but intentionally did not advertise it." Marc Caputo, *Exclusive: How the White House ignored a judge's order to turn back deportation flights*, Axios (Mar. 16, 2025).[38]

60.     The President's invocation of the AEA was at odds with the statements of local officials in places where TdA members had allegedly wreaked havoc, with U.S. intelligence reports, and with all available evidence about TdA's (lack of) connection to former Venezuelan President Maduro. However, none of those factors prevented the Administration from implementing the AEA because they were motivated by animus towards Venezuelans.

61.     Armed with an AEA that, as implemented, would deny due process to all individuals subject to it, the Administration had the tool it needed to effectuate this agenda. In fact, earlier on March 14, 2025, apparently because she knew that the Proclamation would be imminently released, Attorney General Pam Bondi released a "Memorandum for Law Enforcement Officers" to effectuate the Proclamation, noting that "[t]his guidance shall take effect when the Proclamation is made public by the President." Memorandum for Law Enforcement Officers, Attorney General Pam Bondi, DOJ at 1 (Mar. 14, 2025) (the "DOJ Memorandum"),

---

[38] *Available at* https://www.axios.com/2025/03/16/trump-white-house-defy-judge-deport-venezuelans.

Exhibit C. The DOJ Memorandum reiterated the summary removal of Venezuelan nationals designated as members of TdA. *Id.*

62.    These developments established an environment wherein Venezuelan nationals, including those lawfully present in the United States, were treated as "subject to summary apprehension" and presumptively removable as "Alien Enemies" under the AEA, without due process and with heightened risk of severe consequences, such as third-country transfer and confinement in a place described as "hell on earth," CECOT.

**B.    Plaintiff had an Ongoing Immigration Case, Set Hearing Date, and Strong Community Ties When He was Detained and then Wrongfully Removed without Due Process.**

63.    Plaintiff Neiyerver Adrián Leon Rengel was born on March 13, 1998, in Caracas, Venezuela.

64.    On June 12, 2023, Plaintiff came to the United States.

65.    Plaintiff entered the United States at the Paso del Norte Port of Entry in El Paso, Texas, after appearing for a pre-scheduled appointment through the CBP One program. He underwent required screenings, provided biometric information, and was released into the United States. Plaintiff has an immigration court hearing set for April 4, 2028. *See* Exhibit B.

66.    In December 2024, Plaintiff applied for Temporary Protected Status, which remained pending at the time of his detention.

67.    Upon entering the United States, Plaintiff moved to Irving, Texas where he lived with his girlfriend, helped raise her daughter, and maintained close ties with his brother and mother.

68.    Plaintiff worked as a barber in Irving and developed a positive relationship with his employer, who described Plaintiff in a letter dated March 2, 2025 as "honest, dependable, peaceful, and conscientious . . . with everyone he meets."

69.    On March 13, 2025, Plaintiff's birthday, he was on his way to work when he was detained by ICE officers in the parking garage of his apartment complex in Irving, Texas.

70.    When confronted by the ICE officers, Plaintiff explained that he had entered the United States at a port of entry, had a pending immigration court hearing, and had applied for TPS. Plaintiff presented documentation substantiating these facts and his compliance with immigration procedures.

71.    ICE officers then ordered Plaintiff to display his tattoos and asserted, without further explanation or evidence, that the tattoos indicated affiliation with TdA. Plaintiff immediately denied this allegation, as he has never been a part of TdA, or any other gang, nor does he have any other affiliation with or connection to TdA. Plaintiff's tattoos include the names Sandra and Isabela—his mother and daughter—a barbershop, and a tiger, rather than any symbols connected with TdA. But ICE officers ignored Plaintiff's explanations and documentation and took him into custody.

72.    Plaintiff was initially taken to a Walmart where he was transferred to another vehicle that transported him to the ICE office. When they arrived there, ICE officers placed Plaintiff in a cell along with other detainees. They presented him, and all other Venezuelan detainees, with the "option" of being deported to their home country or appearing before a judge. Plaintiff then requested a hearing before a judge and a phone call, but he was never given the opportunity for either. Instead, ICE officers entered the cell and photographed his tattoos.

73.    On March 14, 2025, Plaintiff was transferred to a detention center in south Texas.

74.    Also on March 14, 2025—unbeknownst to him—Plaintiff became subject to Washington officials' AEA implementation scheme upon President Trump's signing of the Proclamation and the immediate effect of the DOJ Memorandum.

75.    At approximately 6:00 a.m. ET on March 15, 2025, Plaintiff was woken up and told to change. Without any mention of the hearing before a judge he had requested, Plaintiff was informed by law enforcement officers that he would be imminently deported to his home country of Venezuela. Plaintiff was again not given an opportunity to contest this removal nor his improper identification as a member of TdA.

76.    Plaintiff was eventually loaded onto a bus in handcuffs and shackles and taken to an airport in Harlingen, Texas where three GlobalX planes were waiting. Those three GlobalX planes would ultimately transport individuals, including Plaintiff, to El Salvador. After waiting more than an hour, Plaintiff was one of the first five men called from his bus and ushered onto a GlobalX plane.

77.    Plaintiff's plane was the first of the three to take off from Harlingen. Plaintiff was able to observe this clearly, as he saw the other two GlobalX planes on the tarmac while his was taking off. Once Plaintiff's plane was up in the air, the windows were covered for the duration of the flight.

78.    Sitting shackled and cuffed, Plaintiff believed that he was being deported to his home country of Venezuela because that is what law enforcement officers told him. To Plaintiff's knowledge, every detainee on the plane had been told the same. Because of this, the atmosphere on the plane was relatively calm. During this period of calm, Plaintiff met the detainee next to him, A.,[39] who told Plaintiff about his medical condition. The tranquil atmosphere on the plane changed soon, however, and Plaintiff began feeling concerned once the windows were covered and he and the other passengers were prohibited from looking out the windows for the duration of the flight.

---

[39] This person's first name has been omitted for his privacy and safety.

79.     Upon final landing, the window coverings were removed and Plaintiff realized that he was not in Venezuela but in San Salvador, the capital city of El Salvador, and that ICE had lied to him about his destination. Over the next two hours, Plaintiff and his fellow Venezuelan detainees began protesting deplaning because they were not in their home country.

80.     Their protests were met with violence when Salvadoran officials came aboard the plane at the direction of United States officials, and with their authorization, the Salvadoran officials began abusing the Venezuelan detainees. These Salvadoran officials struck detainees repeatedly in full view of the United States officials aboard the plane. For those detainees that refused to stand and deplane, the Salvadoran officials, again with the authorization of the United States officials aboard the plane, went through the plane two Salvadoran officials at a time, striking the detainee and then picking the detainee up and carrying them out of the plane against their will. From there, Plaintiff observed certain detainees being thrown down stairways.

81.     During this terrifying period, Plaintiff witnessed the second and third GlobalX planes land.

82.     After this initial round of abuse, Plaintiff and the other Venezuelan detainees were transported to CECOT.

83.     After United States and GlobalX officials aboard the plane witnessed the abuse the Salvadoran officials waged against Plaintiff and the rest of the detainees, it was clearly foreseeable to them that in CECOT the detainees would suffer the constant, cruel, and unusual punishments from which Plaintiff has still not recovered.

84.     DHS officials subsequently made baseless defamatory accusations to vilify and publicly humiliate Plaintiff, stating without evidence that Plaintiff "is an associate of Tren De Aragua, [which] is a vicious gang that rapes, maims, and murders for sport. President Trump and

23

[DHS] Secretary [Kristi] Noem will not allow foreign terrorist enemies to operate in our country and endanger Americans." Suzanne Gamboa, *After a month of searching, man learns from NBC News that DHS sent his brother to El Salvador*, NBC News (Apr. 22, 2025).[40]

85.    It was not until April 22, 2025 that DHS publicly acknowledged that Plaintiff is Venezuelan and that he had been sent to El Salvador.

**C.    Unlawful Detention, Deportation, and Violation of Court Order Caused Severe and Lasting Emotional Distress and Other Injuries.**

86.    "In the early morning hours of March 15, Venezuelans [] were taken from their cells, shackled, and loaded onto [GlobalX] planes. Unbeknownst to [him], the Government had deemed [Plaintiff a] member[] of Tren de Aragua and sought to remove [him] immediately pursuant to the Proclamation, which had yet to be shared with the public or with [Plaintiff]." *J.G.G.*, 2025 WL 3706685, at *1. Plaintiff and the other men were given "'no advance notice of the basis for their removal,' nor were they informed that they could challenge their designation." *Id.*

87.    Thus, starting at least in the evening of March 14 or in the early hours of March 15, 2025, Plaintiff was unlawfully detained and denied due process for purposes of unconstitutional removal pursuant to the Proclamation and DOJ Memorandum in order to effectuate the Administration's purpose of punishing Venezuelans and deterring them, and non-citizens more broadly, from pursuing legitimate avenues to immigration.

88.    Public reporting has repeatedly described Stephen Miller as the prime architect and implementer of White House efforts to effectuate mass deportations. *See, e.g.*, Nick Miroff &

---

[40] *Available at* https://www.nbcnews.com/news/latino/venezuelan-brother-deported-el-salvador-family-looking-rcna202279.

Jonathan Lemire, *Stephen Miller Has a Plan*, The Atlantic (Mar. 19, 2025).[41] But Mr. Miller was not the only Administration official that conspired to flout judicial review.

89.     According to whistle-blower testimony submitted to the U.S. Senate, on March 14, 2025, top officials at the DOJ held a meeting to plan how they would implement the Proclamation (which was then still forthcoming).

90.     In attendance were then-Acting Deputy Attorney General Emil Bove, Counselor to the Deputy Attorney General James McHenry, Associate Deputy Attorney General Paul Perkins, Deputy Assistant Attorney General of the Office of Immigration Litigation ("OIL") Drew Ensign, Acting Director for OIL August Flentje, Acting Deputy Director of OIL Erez Reuveni, and other OIL attorneys. Letter from Senator Sheldon Whitehouse to Chief Justice John G. Roberts, Jr., at 9 (July 30, 2025).[42]

91.     Mr. Bove told the attorneys present that planes containing individuals subject to the Proclamation would be taking off that weekend *(i.e.*, March 15 to 16), and directed that the planes needed to take off no matter what. *Id.* Mr. Bove reflected on the possibility that a court order would enjoin those removals before they could be effectuated and personally stated that DOJ lawyers might need to ignore any court order by telling the courts "f - - -  you" in order to implement the Administration's AEA removal scheme. *Id.* Later, Mr. Reuveni stated in a text message, "[g]uess we are going to say f[- - -] you to the court." U.S. Senate Comm. on the Judiciary, *Reuveni Batch 2 Index and Evidence (Redacted Final)* (July 7, 2025).[43]

---

[41] *Available at* https://www.theatlantic.com/politics/archive/2025/03/stephen-miller-presidency/682097/.

[42] *Available at* https://www.whitehouse.senate.gov/wp-content/uploads/2025/08/2025-07-30-Letter-to-CJ-Roberts-Boasberg-Complaint.pdf.

[43] *Available at,* https://www.judiciary.senate.gov/imo/media/doc/07-07-2025%20-%20Reuveni%20Batch%202%20Index%20and%20Evidence%20(REDACTED%20FINAL).pdf.

92.     Mr. Reuveni has substantiated this conversation in detail by, among other things, providing contemporaneous text messages with his former superior, Mr. Flentje. He has also provided those messages to Congress.

93.     The Administration's plan to deport the individuals subject to the AEA that weekend is corroborated by its interaction with the government of El Salvador in the days leading up. First, "[o]n March 13, the U.S. Embassy in San Salvador sent a note to El Salvador's Ministry of Foreign Affairs, stating that it 'has the honor to request that El Salvador accept, by March 14, 2025,'. . . 'up to 500 Venezuelan Tren de Aragua (TdA) members.'" Further, the note "serve[d] as 24-hour notice of the arrival of the…500 Venezuelan TdA members." Plaintiffs' Motion for Summary Judgment at 5-6 (quoting Ex. 14, at 1-2), *Robert F. Kennedy Hum. Rts., et al. v. Dep't of State, et al.*, No. 1:25-cv-01774-JEB (D.D.C. Sept. 9, 2025).

94.     At 1:12 a.m. on Saturday, March 15, after the Proclamation was issued but before it had been publicly released, a class action lawsuit was filed on behalf of Venezuelan immigrants challenging the President's invocation of the AEA. Letter from Government Accountability Project, *supra* para. 18, at 8. Plaintiffs immediately moved for a temporary restraining order ("TRO") to halt the Venezuelan nationals' imminent removal under the Proclamation. *Id.*

95.     Plaintiffs' counsel informed the presiding judge, James E. Boasberg of the U.S. District Court for the District of Columbia, that at least one plaintiff was already aboard a removal flight. Judge Boasberg promptly entered an *ex parte* TRO prohibiting the removal of the five named plaintiffs and scheduled a hearing for 5:00 p.m. that afternoon, March 15, 2025, on a classwide TRO. *See J.G.G. v. Trump,* No. 1:25-cv-00766, ECF No. 81 at 8-9.

96.     Plaintiff is part of the class later certified by Judge Boasberg in *J.G.G. v. Trump.* Upon his detention, Plaintiff was informed multiple times that he had been detained because his

tattoos indicated membership in TdA. Further, Plaintiff was on the first GlobalX plane that left the United States and landed in El Salvador, which departed and deplaned in violation of the court order. All available evidence shows that Plaintiff was eventually detained and then deported pursuant to the AEA.

97.    During the 5:00 p.m. hearing in *J.G.G. v. Trump*, Mr. Ensign appears to have intentionally misled the Court, saying he was unaware of whether AEA removal flights would take place "in the next 24 or 48 hours," despite having been present when Mr. Bove explicitly informed him and his colleagues that flights would take off that weekend—and that they must take off no matter what. *Id.* at 9. Indeed, while the hearing was taking place, one of Mr. Reuveni's colleagues, listening to Mr. Ensign's statements before Judge Boasberg, texted Mr. Reuveni, "Oh shit. That was just not true," adding "I can't believe he said he doesn't know" and "He knows there are plans for AEA removals within the next 24 hours." Mr. Reuveni replied, "Yes he does." The colleague added that it was "a question if [Mr. Ensign] [*sic*] gets out without a sanction." *Reuveni Batch 2*, supra para. 91, at 8–9.

98.    By 6:44 p.m. on March 15, Judge Boasberg was in the process of issuing an oral order for a TRO. Mr. Reuveni simultaneously emailed attorneys with the DHS Office of the General Counsel, ICE Office of the Principal Legal Advisor, and the State Department Office of Legal Advisor, informing them: "The judge is presently issuing a class-wide TRO. Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?" Letter from Government Accountability Project, *supra* para. 18, at 11.

99.    Two minutes later, Mr. Reuveni emailed DHS the substance of Judge Boasberg's TRO oral order on class certification and the TRO: "The class is 'all noncitizens in US custody

subject to the AEA'[;] a minute order with more specifics will issue. Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air." *Id.* DHS was thus effectively informed at least by 6:46 p.m. on March 15, 2025, that persons in the class of which Plaintiff is a member were protected under Judge Boasberg's TRO. That was followed by a final update two minutes after that, at 6:48 p.m., that "the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air." *Id.* Judge Boasberg highlighted the urgency and importance of compliance with his order, telling DOJ: "[T]his is something that you need to make sure is complied with immediately." *Id.* at 12.

100.    During this crucial period of time, senior government officials debated whether to turn the planes around. Consistent with Mr. Miller's admonitions that individuals subject to the AEA be denied due process, Mr. Miller reportedly demanded that the government keep the planes in the air en route to El Salvador. Josh Dawsey & Rebecca Ballhaus, *Stephen Miller's Fingerprints Are on Everything in Trump's Second Term,* WSJ (June 20, 2025).[44]

101.    And despite the Court's injunction, that is precisely what happened.

102.    Indeed, reportedly, once the Proclamation had leaked by Saturday morning, Mr. Miller orchestrated "a mad scramble to get [GlobalX's] planes in the air," apparently because it was clear the process was unlawful and that the planes needed to be "on the ground first, before a judge could get the case" and issue an order enjoining the deportations. Caputo, *supra* para. 59.

---

[44] *Available at* https://www.wsj.com/politics/policy/stephen-miller-trump-immigration-c1e0e924?gaa_at=eafs&gaa_n=AWEtsqf7KO_bezxFm08G-A6EW7qKxf7su4nCcW58kvx-TjeJ53Wx9Xh_x78n565_iBA%3D&gaa_ts=69b07ba9&gaa_sig=-CvcjXb_fv0gUU0U51_9zSc7LbA44oIi2YxaBdzVKMBcVs6Aa2QWexRKBl6fp-1GKt_NzkrxUjdIteLZpZK5Mw%3D%3D.

103.    During an adjournment in the middle of the hearing which started at 5:22 p.m. ET, two GlobalX removal flights left Harlingen, Texas, at 5:26 p.m. and 5:45 p.m. ET. Letter from Government Accountability Project, *supra* paragraph 18, at 10. A third GlobalX removal flight left Harlingen, Texas at 7:37 p.m. ET. *See J.G.G. v. Trump,* No. 1:25-cv-00766, ECF No. 81 at 8. As noted above, Plaintiff was on that first flight.

104.    As the flights were in the air, now subject to a court order requiring that they turn around, Mr. Bove provided DHS with legal advice, advising the agency to proceed in violation of that order. Defendants' Response to Court Ord. (Doc. 195), *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Nov. 25, 2025). Secretary Noem then directed that the GlobalX planes continue on to El Salvador. *Id*.

105.    The government reported that the first two removal flights left U.S. airspace before Judge Boasberg's 6:45 p.m. oral TRO instructions and "landed abroad" sometime after the minute order was placed on the docket at 7:25 p.m. The first and second planes landed in Honduras, on the way to El Salvador, at 7:37 p.m. and 8:10 p.m. ET, respectively. The third removal flight landed in Honduras at 9:50 p.m. ET.

106.    The first removal flight landed in El Salvador at 11:10 p.m. ET on March 15. The second and third removal flights landed in El Salvador at 12:18 a.m. ET and 1:08 a.m. ET on March 16, 2025.

107.    The individuals on those airplanes, including Plaintiff, were thus deplaned over 5 hours *after* Judge Boasberg issued his order.

108.    Through the morning of March 16, 2025, Mr. Reuveni continued to repeatedly email DHS, State Department, and DOJ colleagues, attempting to ensure that no one subject to the AEA in government custody would be removed in violation of Judge Boasberg's injunction. Letter

from Government Accountability Project, *supra* para. 18, at 13. Mr. Reuveni also requested information about the three flights, including the two in the air when the oral order was issued, but he received no substantive response. *Id.* at 13-14.

109.    Judge Boasberg later found that the Government's actions on March 15 "demonstrate[d] a willful disregard for" the court's order, "sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt." *Id.* at 3 n.8. (finding probable cause to hold the Government in criminal contempt; while that specific probable cause order was vacated by the D.C. Circuit, a majority of the D.C. Circuit disagreed with that decision and the District Court is now again adjudicating the contempt proceedings).

110.    Plaintiff was wrongly detained for removal and then removed because of President Trump's Proclamation, the DOJ Memorandum implementing it, and the specifically unlawful directives of Mr. Miller, Secretary Noem, Mr. Bove and Mr. Ensign, alongside other top officials at DHS, DOJ and the State Department, working in conjunction with GlobalX and President Bukele.

111.    On April 7, 2025, the U.S. Supreme Court ruled that individuals detained pursuant to the AEA require notice "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G. v. Trump*, 604 U.S. 670, 673 (2025) (per curiam). Plaintiff received no such notice.

112.    The United States government, in other filings, has misrepresented that it had neither the ability to secure the return of the detainees it wrongfully removed to CECOT nor the authority to do so. Defendants' Memorandum of Law in Opposition to Plaintiffs' Emergency Motion for Temporary Restraining Order, *Abrego Garcia v. Noem,* No. 8:25-cv-00951-PX (D. Md. Mar. 31, 2025), ECF No. 11. President Bukele added to the confusion when he stated that he

did not have the power to return one of the individuals removed to the United States. Dareh Gregorian, Katherine Doyle & Lawrence Hurley, *El Salvador's president says he won't return mistakenly deported man to U.S.*, NBC News (Apr. 14, 2025).[45] This was all despite the director of CECOT himself stating to Plaintiff and the other detainees, "if it were up to me, I would let you go," but the order to continue their detention "comes from Donald Trump." *J.G.G.*, 2025 WL 3706685, at *16. Meanwhile, Secretary Noem, "the very official who apparently made the decision to relinquish U.S. physical custody over Plaintiff[]" made repeated statements demonstrating that she "conceived of CECOT as an extension of U.S. detention facilities." *Id* at *17. Thus, the Administration and President Bukele's comments worked in tandem in an attempt to lead the public to believe that there was no entity with the authority to return the imprisoned men from CECOT.

113.    However, months later the Administration's assertions that it lacked authority over the CECOT prisoners were contradicted by the government of El Salvador. In communications to the United Nations, El Salvador has represented that: "The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters." Ex. 1 to Plaintiffs' Notice of Filing at 5 (Doc. 160-1), *J.G.G. v. Trump*, No. 1:25-cv-0766-JEB (D.D.C. July 7, 2025), (U.N. Working Group on Enforced or Involuntary Disappearances, Reports on Enforced or

---

[45] *Available at* https://www.nbcnews.com/politics/trump-administration/president-el-salvador-wont-return-deported-man-kilmar-abrego-garcia-rcna201136.

Involuntary Disappearances — El Salvador). In other words, the United States government had exclusive control over Plaintiff and members of the class during their imprisonment in CECOT.

114. Only eleven days after this admission, on July 18, 2025, Plaintiff was released from CECOT and sent back to Venezuela as part of a prisoner swap agreement between the United States and Venezuela. Plaintiff's release—along with over 250 other Venezuelan migrants the United States government had removed from the United States and sent to CECOT—demonstrates that the United States government always had the ability to secure Plaintiff's release from CECOT. In fact, Judge Boasberg recently ruled that the United States had "constructive custody" of the Venezuelans during their incarceration in CECOT. *J.G.G.,* 2025 WL 3706685, at \*1.

**D.      Foreseeable and Intended Abuse at CECOT.**

115. Despite the United States' constructive custody over Plaintiff, he remained imprisoned in CECOT for four months solely because of his Venezuelan nationality and the Administration's unlawful scheme. During that imprisonment, Plaintiff endured a vicious cycle of physical, verbal, and psychological abuse which was foreseeable for the United States Administration and its officials. Indeed, the abuse Plaintiff suffered in CECOT was intended. The terror that Plaintiff and his fellow Venezuelans would face throughout their imprisonment was a necessary aspect of the Administration's agenda.

116. After the violence perpetrated by Salvadoran officials aboard the GlobalX plane and the tarmac outside of it, Plaintiff, still shackled and cuffed, was marched into CECOT. Plaintiff and the rest of the Venezuelan detainees were lined up along the floor and made to lean forward in the prone position. Prison guards then forced them to rest their heads on the person in front of them.

117. The CECOT director then walked in and stated "The infamous Tren de Agua . . . welcome to hell." As Plaintiff sat there in the prone position, CECOT guards walked by and

assaulted him and his fellow detainees with batons. Then the guards began picking up all the detainees by the hands, their hands still cuffed behind their backs. The guards dragged the detainees, their faces to the floor, across the prison floor and into their cells. Finally in their cells, Plaintiff was told there was "no escape" and that "they would be there for a minimum of ninety years." Plaintiff, a young barber who was never affiliated with any gang in Venezuela or in the United States, was terrified.

118.    The next morning, Plaintiff was taken out of his cell and beaten with batons and fists, suffering injuries to his chest and stomach. He was told that the beating was the treatment gang members received in CECOT. Later, he was taken to an area of the prison without cameras, where guards routinely brought detainees to assault them without leaving a video record. There too, Plaintiff was viciously beaten.

119.    Plaintiff was regularly forced to witness guards take a detainee from their cell, force the detainee into a kneeled position out front of the cell, and beat the detainee. One detainee was beaten so severely his scalp opened up, while others soiled themselves during the beatings. Plaintiff regularly suffered similar such beatings, including on one occasion when he was held in solitary confinement overnight and beaten by multiple guards.

120.    Plaintiff and the rest of the Venezuelan detainees were cordoned off from the rest of the prison population. Living with twelve other men in one cell, Plaintiff was almost never allowed to leave his cell. He was never allowed to exercise or walk outside. The shower, the urinal, and the bathroom were in the cell without any partition, so the detainees had no privacy (unless they were sent to solitary confinement). Plaintiff's cell was only cleaned once a week, he was forced to drink the same water he used to shower and the lights in CECOT were never turned off

no matter the time of day or night. And in that constant light, Plaintiff slept on a metal slat with no cushions or pillows in stacked bunk-beds four people high.

121.   Although Plaintiff suffers from gastritis, he was not given any medication for his condition; instead, whenever he had complaints about his gastritis, he was merely given water. Because of this, Plaintiff suffered from heartburn and stomach pain during his imprisonment in CECOT.

122.   Plaintiff later sustained an injury to his left hand from the restraints that CECOT guards used on him. When he complained of that injury, he was refused medical care.

123.   On one occasion, A., the detainee Plaintiff had met aboard the GlobalX plane, had an acute diabetic episode that left him convulsing and passed out in the cell. CECOT had denied A. medical care throughout the imprisonment and even as he lay there convulsing, he received no legitimate medical care. The experience of attempting to keep A. alive while watching him violently convulse haunts Plaintiff to this day.

124.   Throughout his imprisonment, Plaintiff was never allowed to speak to his family or an attorney. The Red Cross visited CECOT on June 12, 2025 and spoke with Plaintiff for 30 minutes; that was his only outside contact throughout the duration of his stay in CECOT. Only at that point, after nearly 90 days, did Plaintiff's family receive confirmation of his precise location.

125.   Plaintiff and his fellow detainees were eventually released to their home country of Venezuela. A week before that, CECOT finally brought doctors in to get them in shape for their return.

126.   Of course, the impacts of Plaintiff's incarceration did not end with his release.

127.   Returning to Venezuela has been a major adjustment, as he suffers significant psychological trauma that makes it difficult to maintain work.

34

128. Plaintiff's left hand has still not recovered. He has lost strength and agility in that hand and can no longer lift heavy weights. Plaintiff works at a grocery store where he is occasionally required to make deliveries involving heavy lifting, which he can no longer perform due to his injury.

129. Plaintiff's birthday just passed, but because it now not only marks the day he was born, but the day he started his journey to a place known as "hell," he did not celebrate and is not sure he ever wants to celebrate that day again. While he is happy to be out of prison and back with his daughter, painful memories come to him in his sleep most nights, and he wakes up crying.

130. In light of the widely reported inhumane conditions at CECOT and senior officials' statements treating transfer to CECOT as a "consequence," the risk of severe physical and psychological abuse was the foreseeable and intended result of Defendants' decision to remove Plaintiff to El Salvador while maintaining constructive custody and refusing to secure his prompt return.

131. Further, Plaintiff's imprisonment in CECOT promoted the Administration's goal of deterring non-citizens from pursuing legitimate avenues towards legal status by using the threat of such imprisonment to instill terror in the Venezuelan population. This intention was voiced by Secretary Noem as recently as September 3, 2025: "If you are in America illegally, you could find yourself in CECOT . . . . Avoid arrest and self deport now using the CBP Home App." Press Release, U.S. Dep't of Homeland Sec., *Louisiana Lockup: A New Partnership with DHS and the State of Louisiana to Expand Detention Space* (Sept. 3, 2025).[46]

132. As of October 2025, more than thirty-four thousand people had taken the Administration on its word by applying for voluntary departure, while another twenty-five

---

[46] *Available at* https://www.dhs.gov/news/2025/09/03/louisiana-lockup-new-partnership-dhs-and-state-louisiana-expand-detention-space.

thousand people had self-deported using CBP Home, including at least 3,700 Venezuelans. Melissa Sanchez & Mariam Elba, *"I Don't Want to Be Here Anymore": They Tried to Self-Deport, Then Got Stranded in Trump's America*, ProPublica (Oct. 10, 2025).[47]

**E.     The Administration's Implementation of the AEA and Detention of Plaintiff Violated Due Process, a Mandatory Court Order and Numerous Non-Discretionary Obligations on Federal Agents.**

133.    "[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." *A. A. R. P.*, 605 U.S. at 91. Plaintiff has a clearly established right under the Fifth Amendment not to be deprived of liberty without due process of law.

134.    "Due process requires notice that is reasonably calculated, under all the circumstances, to apprise interested parties and that afford[s] a reasonable time . . . to make [an] appearance." *Id.* at 94-95 (citations and internal quotation marks omitted). The U.S. Supreme Court has recently affirmed that "AEA detainees must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief before removal. In order to actually seek habeas relief, a detainee must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief." *Id.* (citations, internal quotation marks, and alterations omitted).

135.    Equal protection under the Fifth Amendment protects against selective prosecution when "others similarly situated have not been subject to enforcement proceedings by the government and [] there was an impermissible basis for the decision to institute enforcement action against [the class], such as race, religion, or arbitrary classification." *D.A.*, 663 F. Supp. at, 733 (W.D. Tex. 2023) (quoting *United States v. Sage Pharm., Inc.,* 210 F.3d 475, 480 (5th Cir. 2000)).

---

[47] *Available at* https://www.propublica.org/article/trump-self-deportation-cbp-home-app.

136.    The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on persons in government custody, including through deliberate exposure to conditions involving "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotation marks omitted). Because the United States retained constructive custody over Plaintiff throughout his imprisonment at CECOT, Plaintiff has a clearly established right under the Eighth Amendment not to be subjected to cruel and unusual punishment, and the federal officials described herein who placed and maintained him in that custody are the proximate cause of the violations of that right.

137.    Plaintiff was not provided timely or meaningful notice that he was being designated for removal under the AEA. Nor was he afforded any individualized determination, neutral decisionmaker, or opportunity to contest the Government's allegations. Instead, federal officials from Washington D.C. devised and implemented an unconstitutional scheme by which Plaintiff and his fellow Venezuelans would be denied these most basic procedural safeguards because of their national origin. The resulting deprivation of liberty was therefore unlawful and the actions of the federal officials and law enforcement officers described herein were the proximate cause of Plaintiff's injuries.

138.    Further, the Proclamation specifically targeted Venezuelans immigrants, subjecting them to enforcement mechanisms that denied them due process. The Proclamation did not target other similarly situated populations in the United States, and it was not only based on the impermissible classification of Venezuelan nationality, but also for the purpose of punishing Venezuelan immigrants and deterring them from pursuing legal paths to immigration. The resulting violation of Plaintiff's equal protection under the laws was therefore unlawful and the

actions of the federal officials and law enforcement officers in invoking and implementing the AEA were the proximate cause of Plaintiff's injuries.

139.    Plaintiff suffered cruel and unusual punishment while imprisoned in CECOT, including physical and psychological torture, solitary confinement, inhumane living conditions, and deliberate indifference to medical care. These conditions and the physical abuse inflicted on Plaintiff were the direct, proximate result of the decisions of federal officials who placed and maintained him in constructive U.S. custody at CECOT, and they constitute cruel and unusual punishment in violation of the Eighth Amendment.

140.    The unconstitutional and unlawful conduct described throughout this Complaint is not shielded by the FTCA's discretionary function exception ("DFE"), 28 U.S.C. § 2680(a). The DFE protects only those governmental actions involving a genuine element of judgment or choice that reflects the kind of policy decision Congress intended to insulate from judicial review. None of the conduct at issue here qualifies. Federal officials had no lawful discretion to violate the Constitution, to defy a federal court order, to act beyond the bounds of their statutory authority, violate mandatory, non-discretionary legal duties under agency policy or to subject persons in their constructive custody to torture, deliberate medical neglect, and conditions of confinement that shock the conscience.

## CAUSES OF ACTION

### COUNT I: Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence (Brought Against the United States)

141.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

142.    In order to state a claim for negligence under Texas law, the Plaintiff must show there was: "'the existence of a legal duty, a breach of that duty, and damages proximately caused

by the breach.'" *Rodriguez-Escobar v. Goss,* 392 S.W.3d 109, 113 (Tex. 2013) (per curiam) (quoting *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)).

143. In order to state a claim for negligence under D.C. law, "[Plaintiff's] claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011) (citing *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984)).

144. Federal officials owed Plaintiff a duty to exercise ordinary care when directing and supervising the detention and removal decisions the entire time Plaintiff was in government custody. Starting at least in the evening of March 14 or in the early hours of March 15, 2025, federal officials created an unreasonable and foreseeable risk that, in the absence of procedural safeguards and normal processes, Plaintiff would be wrongfully detained, removed, and exposed to dangerous conditions of confinement. Federal officials also breached their duty by directing Plaintiff's unlawful removal and continued detention to a known high-risk environment where detainees were subject to extreme violence, psychological abuse and denial of medical care. These breaches were a proximate cause of Plaintiff's severe physical injuries and emotional trauma.

145. Law enforcement officers who detained and removed Plaintiff owed him a duty of reasonable care arising from their physical custody and control over his person. Having assumed physical custody over Plaintiff, immigration officers were required to ensure that Plaintiff's confinement and removal were legally authorized and did not expose him to foreseeable risks of serious harm. The officers breached this duty by detaining and removing Plaintiff without lawful authority and delivering him to a foreseeably high-risk facility known to subject detainees to

39

violence, overcrowding and denial of medical care. These breaches were a proximate cause of severe physical and emotional trauma suffered by Plaintiff.

**COUNT II: Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress (Brought Against the United States)**

146.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

147.    In order to state a claim for intentional infliction of emotional distress under Texas law, a plaintiff must show "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (citation omitted).

148.    Under D.C. law, "[t]o succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Armstrong v. Thompson*, 80 A.3d 177, 189 (D.C. 2013) (citation and internal quotation marks omitted).

149.    Federal officials intentionally directed and implemented an unconstitutional immigration scheme, which included extreme and outrageous conduct such as denying Plaintiff due process, unjustly separating Plaintiff from his family and livelihood, and ultimately severely punishing Plaintiff through physical and psychological means. Indeed, this conduct was intended to accomplish this goal by punishing Plaintiff and other Venezuelans, depriving them of their constitutional rights, and causing fear and intimidation through the extreme and outrageous actions detailed throughout the Complaint. As a result of their conduct, Plaintiff was prevented from pursuing legal immigration claims and suffered profound fear, humiliation, and anguish over his own safety and the safety and well-being of his family.

40

150.     Federal officials and law enforcement officers further intentionally and outrageously forced Plaintiff to watch fellow Venezuelans be abused on the plane and on the tarmac as he awaited his imprisonment in CECOT—after lying to him about where he was going. Further, law enforcement officers intentionally and recklessly confined Plaintiff in CECOT while in constructive custody of the United States government where he was forced to endure physical and psychological torture.

### COUNT III: Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Abuse of Process (Brought Against Law Enforcement Officers of the United States)

151.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

152.     In Texas, "[a]buse of process is the malicious use or misapplication of process in order to accomplish an ulterior purpose. To show abuse of process, a plaintiff must establish (1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process, (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage resulted to the plaintiff as a result of such illegal act." *D.A.*, 663 F. Supp. 3d at 745 (citations and internal quotation marks omitted).

153.     In D.C., the tort of abuse of process "lies where the legal system has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do." *Bown v. Hamilton,* 601 A.2d 1074, 1079 (D.C. 1992) (citations and internal quotation marks omitted).

154.     Law enforcement officers abused process and authority by executing and utilizing the Proclamation to deny Plaintiff all due process, including in defiance of a court order. Law

enforcement officers executed illegal and improper use of process in furtherance of the Administration's broader unlawful scheme of retribution and intimidation of Venezuelans and other non-citizens, which resulted in Plaintiff suffering from physical injury, mental anguish, and loss of liberty.

155.    Law enforcement officers further abused process and authority by using detention and removal procedures that operated outside permissible immigration law to secretly and deceptively deport Plaintiff outside of his scheduled court hearing, without due process and in violation of a court order.

156.    These actions caused Plaintiff loss of liberty, emotional distress, and loss of legal claims and remedies, and Plaintiff suffered damages as a direct and proximate result.

### COUNT IV: Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### False Imprisonment (Brought Against Law Enforcement Officers of the United States)

157.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

158.    In order to state a claim for false imprisonment under Texas law, Plaintiff must show that defendant "'(1) willful[ly] det[ained another person] (2) without consent[ ] and (3) without authority of law.'" *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002) (quoting *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985)).

159.    In D.C., the gravamen of a complaint for false arrest or false imprisonment is an unlawful detention. *See Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C. 1973); 32 Am.Jur.2d *False Imprisonment* § 7 (2007) ("[t]he essential elements of false imprisonment are: (1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint").

160.    Law enforcement officers committed false imprisonment by willfully continuing to detain Plaintiff pursuant to an unlawful implementation of the AEA, which denied him due process and violated his constitutional rights, for which the officers had no lawful authority.

161.    Law enforcement officers further committed false imprisonment by detaining Plaintiff on a deportation flight to El Salvador despite an existing court order prohibiting his removal, thereby confining him without lawful authority.

162.    These actions caused Plaintiff loss of liberty, emotional distress, and loss of legal claims and remedies, and Plaintiff suffered damages as a direct and proximate result.

### PRAYER FOR RELIEF

163.    Plaintiff respectfully requests the following relief:

a.  A declaratory judgement that the actions described herein deprived Plaintiff of his rights under federal and state law;

b.  Compensatory damages against the United States pursuant to the FTCA in the amount of at least $1,300,000;

c.  Attorneys' fees and costs; and

d.  Such other relief as the Court deems necessary and just.

*/s/ Norman L. Eisen*
Norman L. Eisen (D.C. #435051)
Stephen A. Jonas (D.C. #90037069)
Joshua G. Kolb (#NY0628)
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue, SE, #15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@democracydefenders.org
steve@democracydefenders.org
joshua@democracydefenders.org

-and-

43

Mimi Marziani*
Texas Bar No. 24091906
mmarziani@msgpllc.com
Rebecca (Beth) Stevens*
Texas Bar No. 24065381
bstevens@msgpllc.com
Joaquin Gonzalez*
Texas Bar No. 24109935
jgonzalez@msgpllc.com
Andrew Silberstein*
New York Bar No. 5877998
asilberstein@msgpllc.com
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604

*Motions for Admission Pro hac Vice forthcoming*

**ATTORNEYS FOR PLAINTIFF**