# EXHIBIT A



## VIA OVERNIGHT MAIL AND ELECTRONIC MAIL

JULY 24, 2025

Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave, SE
Washington, DC 20528-0485
ogc@hq.dhs.gov

      Re:    Claim for Damages under the Federal Tort Claims Act

             Neiyerver Adrián Leon Rengel

Dear Counsel:

Democracy Defenders Fund represents Neiyerver Adrián Leon Rengel.

Enclosed please find an administrative claim under the Federal Tort Claims Act. The claim consists of: (1) a Claim Authorization Form; (2) Standard Form 95; (3) Attachment to Standard Form 95 detailing the basis of the claim.

We are submitting this claim without the benefit of formal discovery. Claimant reserves the right to amend or supplement his claim. Please provide confirmation of receipt of this filing and contact information for the attorney who will be handling this matter as soon as possible.

Sincerely,

Norman L. Eisen
Joshua G. Kolb
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE
Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

**Exhibit A**

CLAIM AUTHORIZATION

I, Neiyerver Adrián Leon Rengel, authorize Norman Eisen, Joshua Kolb, and Democracy Defenders Fund to submit and pursue a claim under the Federal Tort Claims Act on my behalf to the Department of Homeland Security, including U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection, and any other government agency, requesting compensation for the unlawful actions of their agents or employees against me beginning on March 13, 2025.

_____

July 23, 2025                                        Neiyerver Adrián Leon Rengel

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| Office of the General Counsel U.S. Department of Homeland Security 2707 Martin Luther King Jr. Ave, SE Washington, DC 20528-0485 ogc@hq.dhs.gov | Neiyerver Adrián Leon Rengel c/o Norman Eisen 600 Pennsylvania Avenue SE Suite 15180 Washington, DC 20003 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 03/13/1998 | Single | 03/13 | 2025 | 9:40 A.M. |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attachment for the remainder of the form.

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

| 11. | WITNESSES |
|---|---|

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| | |

**12. (See instructions on reverse).   AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| | | | |

**I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.**

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

**NSN 7540-00-634-4046**

**STANDARD FORM 95** (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

**INSURANCE COVERAGE**

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance? ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☐ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☐ No | 17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☐ No

---

**INSTRUCTIONS**

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident.  If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid.  A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted.  Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14.  Many agencies have published supplementing regulations.  If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant.  A claim presented by an agent or legal representative must be presented in the name of the claimant.  If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident.  Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

---

**PRIVACY ACT NOTICE**

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A. *Authority:*  The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:*  The information requested is to be used in evaluating claims.
C. *Routine Use:*  See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:*  Disclosure is voluntary.  However, failure to supply the requested information or to execute the form may render your claim "invalid."

---

**PAPERWORK REDUCTION ACT NOTICE**

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501.  Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention:  Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC  20530 or to the Office of Management and Budget.  Do not mail completed form(s) to these addresses.

**STANDARD FORM 95** REV. (2/2007) **BACK**

**Attachment to SF-95**

FTCA Standard Form 95 – Attachment
Claimant: Neiyerver Adrián Leon Rengel

## 8.  <u>Basis of Claim</u>[1]

Neiyerver Adrián Leon Rengel ("Rengel") was detained and removed from the United States without cause or due process. Federal officials lied to Rengel, telling him he was being sent to his country of origin, Venezuela. Instead, for more than four months, Rengel languished in El Salvador – which is not his country of origin and a place where he has no ties – where he suffered physical, verbal, and psychological abuse. For over a month, Rengel's family did not know his whereabouts, despite repeatedly asking government officials at Immigration and Customs Enforcement ("ICE"). Rengel was among the class of removed Venezuelan nationals who were en route to El Salvador when a federal court ordered the United States to turn the planes around and return the individuals to the United States. But the United States government, at the apparent direction of senior White House, Department of Justice and Department of Homeland Security officials — including Stephen Miller, the White House Deputy Chief of Staff and Homeland Security Adviser; and Homeland Security Secretary Kristi Noem; among others — did not do so; instead, Rengel was sent to a notoriously brutal maximum security mega-prison in El Salvador, out of reach from anyone in the outside world, including his family, where he was beaten and abused.

Rengel was born on March 13, 1998, in Caracas, Venezuela. He moved to Colombia with his then-partner and daughter, working there for six years. When the area became unsafe, he moved his partner and daughter back to Venezuela, then went to Mexico and applied to enter the United States.

Rengel entered the United States on June 12, 2023, at the Paso Del Norte port of entry in El Paso, Texas, after appearing for his pre-scheduled CBP One appointment. At that appointment, he underwent screenings and provided his biometrics. He was released and scheduled to appear for a hearing on April 4, 2028, before Immigration Judge Christopher J. Thielemann. Rengel also applied for Temporary Protected Status in December 2024, which was still being processed for approval at the time of his detention.

Rengel worked as a barber and lived with his girlfriend, Alejandra Guitérrez, where he helped raise her daughter. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In November 2024 in Irving, Texas, he pleaded guilty to a Class C Misdemeanor because he was riding as a passenger in a car that contained drug paraphernalia (which was not his and that he was not aware was present in the car before police stopped the car). He was released from custody under an agreement to pay a $492 fine in monthly installments, each of which he had paid on time prior to his detention. Rengel has no further criminal record, and was a valuable and upstanding member of his community. In a March 2, 2025, reference letter, his employer wrote, "I am happy

---

[1] The allegations contained herein are based on information provided by Rengel and his family; published media reports; whistleblower disclosures; and court filings.

to let you know how honest, dependable, peaceful, and conscientious Neiyerver Adrián Leon Rengel is with everyone he meets."

ICE detained Rengel on Thursday, March 13, 2025, on his 27th birthday, in the parking lot of his apartment in Irving, Texas. Rengel presented documentation to the agents reflecting his entry at a Port of Entry ("POE"), his temporary status, and his scheduled appointment in 2028. The agents rejected the documentation.

ICE erroneously claimed that Rengel's tattoos indicated that he was affiliated with the Venezuelan Tren de Aragua gang ("TdA"). In fact, his tattoos have no connection whatsoever with TdA, and Rengel is not a member of that gang. ICE agents asked Rengel to show them all of his tattoos; he complied, lifting his shirt to show them. The agents said that his tattoos indicated affiliation in TdA, a claim which Rengel immediately denied — he told them that his tattoos had no connection to any gang and that all he did was work as a barber. Nonetheless, Rengel was taken into custody. Rengel was given no opportunity to confront or rebut the government's wrong and unsubstantiated accusation of gang affiliation. Such a flimsy pretext for removal — a drastic and catastrophic consequence — has been encouraged by Miller, who, per a media report, has told ICE agents to identify and apprehend supposed gang members based on tattoos.[2]

After Rengel was detained on March 13, he was taken to a Walmart, where he was transferred into another vehicle with different ICE agents. He was then taken to the ICE office, where he was placed in a cell. Rengel asked to make a phone call, but his request was denied. ICE presented him with a document in English; he asked them to translate the document into Spanish, but they did not do so. As he understood it, the document presented him with two options: (1) be deported, or (2) be brought in front of a judge. Rengel requested to see a judge and signed the document. But Rengel was never given the opportunity to appear before a judge.

Rengel was held in the cell until he was transferred later on the same day, March 13, to Bluebonnet Detention Facility. The following day, he was transferred to the East Hidalgo Detention Center. Then, around 10 a.m. on March 15, DHS officials began the process of transferring him out of East Hidalgo. At that point, Rengel was told that he was being deported to his home country of Venezuela. He was taken to an airport, where three planes from GlobalX were waiting.

Rengel was ushered onboard one of these planes along with other Venezuelans. He understood that they had all been told that they were being sent back to their home country of Venezuela, so the atmosphere on the plane was fairly calm.

During the flight, the passengers were not allowed to look out the windows. It was not until the plane landed that Rengel realized that he was not in Venezuela but in San Salvador — and that ICE had lied to him about his destination. He and the other passengers waited for an hour to disembark from the plane. Once the Venezuelans started getting off the plane, Rengel could see through the window that detainees were being mistreated. He watched guards throw detainees down the stairs.

---

[2] Hamed Aleaziz, *Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests,* The New York Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html.

2

Once they deplaned, Rengel and the other Venezuelan detainees were transferred to the custody of the San Salvador police; after another hour of waiting, they boarded a bus and were taken to the maximum-security Center for Terrorism Confinement ("CECOT").

In the United States, immediately after Rengel was taken by ICE agents, his family made repeated attempts to find him. But for five weeks, the government provided the family inconsistent information about Rengel's location. On the day of his detention, his status on ICE's website merely displayed "Call Field Office." The following day, March 14, it showed his location as Bluebonnet Detention Facility. On March 15, the website indicated that Rengel was held at East Hidalgo Detention Center. Then, after three more days, his record disappeared entirely from the ICE website.

Rengel's mother, on her own accord, went to a detention center in Caracas, Venezuela, where deportees are held when they arrive from the United States, but she was told that no one with her son's name was there. Rengel's brother, Nedizon Alejandro Rengel ("Alejandro"), called the East Hidalgo Detention Center on Saturday, March 15, two days after Rengel was detained; personnel from East Hidalgo stated that Rengel was present there. When Alejandro called back the next day, Sunday, March 16, personnel from East Hidalgo said Rengel was no longer there. The following day, Monday, March 17, Alejandro called another number that had been given to him by personnel at East Hidalgo. Alejandro was told that Rengel was not at East Hidalgo and that there appeared to be no record of Rengel ever having been at East Hidalgo. Instead, Alejandro was told that Rengel had been held at the Prairieland Detention Center in Alvarado, Texas. ICE never confirmed to Alejandro that Rengel was no longer in their custody.

Later, ICE confirmed to Guitérrez that Rengel was no longer in ICE custody. Speaking to Guitérrez, an ICE agent initially said that Rengel had been removed to his "country of origin," "El Salvador." When Guitérrez pointed out that Rengel's country of origin was Venezuela, not El Salvador, the ICE officer said nothing further and merely repeated that Rengel had been removed to El Salvador. Eventually, DHS publicly acknowledged that Rengel was a Venezuelan native, not Salvadoran, in response to an NBC News report on April 22, 2025. Still, the government would not confirm where specifically Rengel was sent in El Salvador.

While Rengel's family frantically searched for his location, the White House, the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State ("DOS") worked in concert to circumvent a court order and ensure that Rengel and others were deported to El Salvador. Public reporting indicates that Miller directed the overarching plan and subsequent subterfuge. The original goal was to land the planes carrying Rengel and others to El Salvador before any court could adjudicate the legality of the government's invocation of the Aliens Enemies Act.

On the evening of Friday, March 14, President Trump signed a Proclamation invoking the Alien Enemies Act ("AEA") to remove Venezuelans who were allegedly members of TdA. The Proclamation alleged that TdA is "perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States" and "undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." The President asserted

3

that all Venezuelans 14 years of age and older who are members of TdA could be apprehended, restrained, secured, and removed as Alien Enemies, pursuant to the AEA.

That same day, top officials at DOJ held a meeting to discuss the AEA Proclamation. In attendance was Principal Assistant Deputy Attorney General Emil Bove, Counselor to the Deputy Attorney General James McHenry, Associate Deputy Attorney General Paul Perkins, Deputy Assistant Attorney General of the Office of Immigration Litigation ("OIL") Drew Ensign, Acting Director for OIL August Flentje, Acting Deputy Director of OIL Erez Reuveni, and other OIL attorneys. Bove told the attorneys present that planes containing individuals subject to the AEA Proclamation would be taking off over the weekend of March 15-16, and that the planes needed to take off no matter what. Bove also made a remark that stunned the other attorneys in the room. As reported by Reuveni, Bove, reflecting on the possibility that a court order would enjoin those removals before they could be effectuated, said that DOJ would need to consider ignoring the court order entirely and telling the courts "fuck you." Reuveni's rendition of this conversation is bolstered by numerous contemporaneous text messages with his superior, Flentje, which he has provided to Congress. On March 15, for example, when Judge Boasberg issued his TRO enjoining the flights to El Salvador, Reuveni wrote: "guess its [*sic*] find out time on the 'fuck you'"; to which Flentje responded, "Yup. It was good working with you." A few hours later, after reviewing public information that two flights had landed in Honduras and receiving no responses from his supervisors, Reuveni wrote to a colleague, referencing Bove's vulgar threat to disobey court orders: "Guess we are going to say fuck you to the court. Super." The colleague replied: "Well Pamela Jo Bondi is. Not you."

At 1:12 a.m. on Saturday, March 15, before the AEA Proclamation had been published, the American Civil Liberties Union ("ACLU") filed a class action lawsuit on behalf of Venezuelan immigrants challenging the President's invocation of the AEA and then moved for a temporary restraining order to halt the Venezuelan nationals' imminent removal under the Proclamation. Rengel is part of that class. Plaintiffs' counsel informed the presiding judge, James E. Boasberg of the U.S. District Court for the District of Columbia, that at least one plaintiff was already aboard a removal flight. Judge Boasberg promptly entered an *ex parte* TRO prohibiting the removal of the five named plaintiffs and scheduled a hearing for 5:00 that afternoon on a class-wide TRO. During the hearing, Ensign appears to have misled the Court, saying he was unaware of whether AEA removal flights would take place "in the next 24 or 48 hours," despite having been present when Bove explicitly informed him and his colleagues that there would be — and that they must take off no matter what. Indeed, while the hearing was taking place, one of Reuveni's colleagues, listening to Ensign's statements before Judge Boasberg, texted Reuveni "Oh shit. That was just not true," adding "I can't believe he said he doesn't know" and "He knows there are plans for AEA removals within the next 24 hours." Reuveni replied, "Yes he does." The colleague added that it was "a question if drew [*sic*] gets out without a sanction."

By 6:44 p.m., Judge Boasberg was in the process of issuing an oral order for a TRO. Reuveni simultaneously emailed attorneys with the DHS Office of the General Counsel, ICE Office of the Principal Legal Advisor, and the DOS Office of Legal Advisor, informing them: "The judge is presently issuing a class-wide TRO. Can folks confirm for us if at the moment any individuals subject to the AEA are being staged for removal, or are presently in the air as part of removal (but not yet having landed and disembarked)?" Two minutes later, Reuveni emailed DHS the substance of Judge Boasberg's TRO oral order on class certification and the TRO: "The class is 'all noncitizens in US custody subject to the AEA' a minute order with more specifics will issue.

4

Please confirm receipt of this email and let us know ASAP on the questions below concerning removals not yet effectuated, including those involving folks in the air." DHS was thus effectively informed by 6:46 p.m. on March 15, 2025, that Rengel was part of the class protected under Judge Boasberg's TRO. That was followed by a final update two minutes after that, at 6:48 p.m., that "the judge specifically ordered us to not remove anyone in the class, and to return anyone in the air." Judge Boasberg highlighted the urgency and importance of compliance with his order, telling DOJ: "This is something that you need to make sure is complied with immediately."

Through the morning of March 16, Reuveni continued to repeatedly email DHS, State Department, and DOJ colleagues, attempting to ensure that no one subject to the AEA in government custody would be removed in violation of Judge Boasberg's injunction — and to request information about the three flights, including the two in the air when the oral order was issued, but received no substantive response. Emails and texts amongst DOJ and DHS officials confirm that Justice Department attorneys were concerned that notice of the terms of the nationwide injunction were not properly circulated to agencies to effectively effectuate the injunction, per typical practice. Rengel, as a member of the class who was not a named plaintiff, should have been considered covered by the injunction.

During this crucial period of time, senior government officials debated whether to turn the planes around. Miller strongly urged the government to keep the planes in the air en route to El Salvador.[3] Despite the court's injunction, that is precisely what happened. During an adjournment in the middle of the hearing, two removal flights left Harlingen, Texas, at 5:26 p.m. and 5:45 p.m. ET — a fact the government never shared with Judge Boasberg. Most of those flights' passengers — protected by the TRO — were apparently taken off the plane in El Salvador early on Sunday morning, and transferred to the Salvadoran mega-prison CECOT, in Tecoluca, El Salvador. A senior White House official said that Miller "orchestrated" this process together with DHS Secretary Kristi Noem.

Bove provided DHS with a dubious and flawed legal interpretation to justify deplaning the passengers despite the court's order, arguing that it was permissible to deplane individuals on the flights that departed U.S. airspace before the written minute order had been issued on the docket. The government reported that the removal flights left U.S. airspace before Judge Boasberg's 6:45 oral TRO instructions and "landed abroad" sometime after the minute order was placed on the docket at 7:25. The individuals were deplaned after Judge Boasberg issued his order.

United States and Salvadoran officials bragged about their circumvention of the court's orders. Secretary of State Marco Rubio retweeted a post by the President of El Salvador commenting on a news headline reporting the court's order to return flights to the United States: "Oopsie . . . Too late 😂😂." Nayib Bukele (@nayibbukele), X (Mar. 16, 2025, 7:46 a.m. EDT), https://perma.cc/Y384-4TDW, https://perma.cc/6VTW-5KRD (ellipses in original). The White House's Border Czar, Tom Homan, told Fox News on Monday, March 16: "We're not stopping. I don't care what the judges think, I don't care what the left thinks, we're coming."

---

[3] Josh Dawsey, et al., *Stephen Miller's Fingerprints Are on Everything in Trump's Second Term*, The Wall Street Journal (June 20, 2025), https://www.wsj.com/politics/policy/stephen-miller-trump-immigration-c1e0e924?st=yCayfj&reflink=desktopwebshare_permalink.

5

Judge Boasberg would find that the Government's actions on March 15 "demonstrate[d] a willful disregard for" the court's order, "sufficient for the Court to conclude that probable cause exists to find the Government in criminal contempt." *J.G.G. v. Trump*, 1:25-cv-00766-JEB, ECF No. 81.

The only justification ICE officials have provided about Rengel's detention and deportation is their erroneous allegation that he was a member of TdA (apparently an assessment that was exclusively based on their mistaken interpretation of his tattoos). Therefore, Rengel was removed under President Trump's AEA Proclamation, and was among the members of the class protected by Judge Boasberg's TRO. As such, not only should he not have been detained or deported, he should have been returned to the United States immediately after the TRO was issued. Instead, because of the actions of Miller, Noem, Bove, and other top officials at DHS, DOJ and the State Department, he was missing for nearly three months before his family learned his precise whereabouts — but not from ICE.

While at CECOT, Rengel endured physical, verbal, and psychological abuse. He was beaten in his chest and stomach by guards, who used fists and batons to inflict pain. On one occasion, he was taken to an area of the prison without cameras, where guards routinely brought detainees to assault them without leaving a video record. There, Rengel was viciously beaten.

Rengel was also forced to witness guards severely beating other detainees. To avoid leaving video evidence, guards would turn out the light, take a detainee out of the cell, and attack them outside their cell in front of Rengel and his cellmates.

Rengel endured inhumane and appalling conditions during his confinement. He was held with 18 or 19 other Venezuelan detainees in a cell that was barely larger than ten-feet-by-ten-feet. On most days they stayed in the cell for 24 hours, rarely being permitted to exit. Rengel and his fellow detainees were not allowed out to exercise.

Rengel slept on a metal slat in the cell with no cushions or pillows, stacked bunk-bed style four people high. There were two toilets in the cell that were completely open — Rengel and the other detainees had no privacy. The cell was only cleaned once a week. Although Rengel suffers from gastritis, he was not given any medication for his conditions; instead, whenever he had complaints about his gastritis, he was merely given water.

He was not allowed to speak to his family or an attorney. The Red Cross visited CECOT on June 12 and spoke with Rengel for 30 minutes; that was his only outside contact throughout the duration of his stay in the prison. Only at that point, after nearly 90 days, did Rengel's family receive confirmation of his location.

The United States government, in numerous filings in such cases as *J.G.G. v. Trump*, *Abrego Garcia v. Noem*, and *J.O.P. v. DHS*, has misrepresented that it is unable to secure the return of the detainees it wrongfully removed to CECOT.  In fact, the government of El Salvador has contradicted those claims. In communications to the United Nations, El Salvador has represented that:

> "The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the

scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters."

On July 18, 2025, Rengel was released from CECOT and sent back to Venezuela, as part of a prisoner swap agreement between the United States and Venezuela. Rengel has since returned to his mother's home in ████████████, Venezuela, without any of his personal belongings, since CECOT did not return them to him. He is terrified to return to the United States given the horrendous treatment he endured.

His release — along with over 250 other Venezuelan migrants the United States government had removed from the United States and sent to CECOT — demonstrates that the United States government always had the ability to secure Rengel's release from CECOT. Nevertheless, United States government officials allowed Rengel to languish in CECOT for about four months.

Rengel was negligently, wrongfully, and unlawfully detained and removed from the United States. He was sent to CECOT, where he remained for about four months, and was forced to suffer its horrific and inhumane conditions. United States officials and law enforcement officers breached their duty to Rengel, which has resulted in his loss of liberty as well as psychological and emotional damages. He asserts that the above U.S. government employees, acting within the official scope of their office or employment, committed the following torts: negligence, malicious prosecution, abuse of process, false arrest, false imprisonment, and negligent/intentional infliction of emotional distress.

9.      **Property damage**: No property was damaged.

10.     **Nature and extent of injury**

Rengel sustained psychological and emotional injuries, the proximate cause of which was the government's breach of its duty owed to Rengel. As a result of White House, DHS, ICE, DOJ, and State Department officials' negligent and unlawful acts, Rengel suffered a loss of his liberty, removal from the United States, and months-long detention at the notoriously inhumane CECOT, all of which has caused substantial and continuing emotional distress.

11.     **Witnesses**

Witnesses as to the circumstances of Rengel's unlawful detention and removal include:

Nedizon Alejandro Rengel
Alejandra Gutiérrez
████████████████████

This is not intended to be an exhaustive list of possible witnesses. Rengel believes numerous government officials will also be witnesses to their wrongful conduct.

7

**12.**
- Property Damage: None
- Personal injury: $1,300,000
- Wrongful death: None
- Total: $1,300,000

**13b.**    Phone Number of Person Signing Form

If for any reason DHS believes that this notice of claim is not in compliance with the requirements of the FTCA, or any additional information is required, please contact Norman Eisen, (202) 594-9958, norman@statedemocracydefenders.org.

**15-19**. Rengel does not carry insurance responsive to these requests.