**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**NEIYERVER ADRIÁN LEON RENGEL,**

    **Plaintiff,**

       **v.**

**UNITED STATES,**

    **Defendant.**

**Civil Action No. 26-1008 (JEB)**

---

**MEMORANDUM OPINION**

Plaintiff Neiyerver Adrián Leon Rengel is a Venezuelan national who was summarily removed from the United States and flown to El Salvador's mega-prison CECOT in March 2025 after he was wrongly deemed to be a member of the Venezuelan gang Tren de Aragua. Seeking recompense for his ill treatment, Plaintiff filed suit in this district against the United States under the Federal Tort Claims Act. The Government has now filed a Motion to Dismiss for improper venue. Although this matter presents nuanced venue questions, the Court agrees that it does not belong here. The Court will therefore transfer the case to the Southern District of Texas.

**I.      Background**

The facts underlying this case cover much familiar ground for this Court. It recounts those that are relevant to the discrete issue before it, treating the facts alleged in the Complaint as true, as it must at this stage. In 2025, the President and high-ranking Executive Branch officials began considering a plan to swiftly deport Venezuelan nationals without having to go through ordinary removal proceedings. See ECF No. 5-1 (Compl.), ¶¶ 47–49, 52–53; see also J.G.G. v. Trump, 772 F. Supp. 3d 18, 26 (D.D.C. 2025); J.G.G. v. Trump, 813 F. Supp. 3d 126, 134 (D.D.C. 2025). In February of that year, Secretary of State Marco Rubio negotiated an

1

agreement with the President of El Salvador to house certain detainees of the United States government in a Salvadoran mega-prison called the Terrorism Confinement Center, otherwise known as CECOT.  See Compl., ¶¶ 52, 54.  CECOT was widely reported to be "hell on earth," and then-Secretary of Homeland Security Kristi Noem advertised it as a "consequence[]" of "com[ing] to our country illegally."  Id., ¶¶ 53–54.  In late February, immigration officials began staging Venezuelan detainees at detention centers from which they could be quickly deported.  Id., ¶ 58.

On March 14, the President in a secret Proclamation invoked the seldom-used Alien Enemies Act, see 50 U.S.C. § 21, declaring that a Venezuelan gang called Tren de Aragua had committed an invasion and predatory incursion upon the United States.  See Compl., ¶ 59; J.G.G., 813 F. Supp. 3d at 133–34.  Consistent with that Proclamation, he directed immigration officials to find and summarily deport any person determined to be a member of that gang.  See Proclamation No. 10903, 90 Fed. Reg. 13033, 13034 (Mar. 14, 2025).  That same day, top officials at the Department of Justice met to discuss how to implement the then-forthcoming Proclamation.  See Compl., ¶¶ 89–90.  Then-Acting Deputy Attorney General Emil Bove told the attorneys present that flights carrying Venezuelans subject to the Proclamation were planned for March 15 or 16, and that the planes needed to take off regardless of any court order to the contrary.  Id., ¶ 91.  Also on that same day, then-Attorney General Pam Bondi released a memorandum to law-enforcement officers, providing guidance on how to expeditiously effectuate the removals once the Proclamation was made public.  Id., ¶ 61.

This Court was made aware of the pending removals after several of the detained Venezuelans contacted lawyers, who filed suit in the early hours of March 15, seeking injunctive relief.  Id., ¶ 94; J.G.G., 813 F. Supp. 3d at 134.  The Court granted the five named Plaintiffs'

request for a temporary restraining order that same morning and scheduled a hearing for later that day to consider the class-certification request. See Compl., ¶ 95; J.G.G., 813 F. Supp. 3d at 134. Throughout the morning, Stephen Miller, Homeland Security Advisor and White House Deputy Chief of Staff for Policy, was orchestrating a "mad scramble" to ensure that the planes would get off the ground before they were stopped by a court. See Compl., ¶ 102. Just before the afternoon hearing, the Proclamation was finally issued publicly. J.G.G., 813 F. Supp. 3d at 134. During that hearing, Deputy Assistant Attorney General of the Office of Immigration Litigation Drew Ensign claimed that he did not know whether planes would depart "in the next 24 or 48 hours." Compl., ¶ 97. About twenty minutes into the hearing (and unbeknownst to the Court at that time), the first removal flight took off. Id., ¶ 103. Meanwhile, the Court certified a class of all individuals subject to removal under the Proclamation and issued a TRO enjoining their removal. J.G.G., 813 F. Supp. 3d at 134. Senior Government officials debated turning the planes around, but Bove advised that they should proceed. See Compl., ¶¶ 100, 104. Then-Secretary Noem accordingly directed that the planes continue to El Salvador. Id., ¶ 104; J.G.G. v. United States, No. 25-766, ECF No. 195 (Def. Resp. to Court Order), ¶ 4 (D.D.C. Nov. 25, 2025). The first removal flight landed in San Salvador about four hours after the Court's oral order. See Compl., ¶¶ 105–07. Despite this Court's direction that the Government should not relinquish custody of the detainees, the Government nonetheless ordered them off the plane and into the custody of Salvadoran officials, who imprisoned them in CECOT. Id., ¶¶ 80, 97–109; J.G.G., 813 F. Supp. 3d at 134.

Plaintiff, a Venezuelan national, was one such detainee. He was summarily deported to El Salvador on the first removal flight. See Compl., ¶¶ 77, 96, 103. Rengel had arrived in the United States in 2023 through a port of entry in El Paso, Texas, after appearing for an

appointment that he had scheduled through the Customs and Border Protection phone app.  Id., ¶¶ 63–65.  His immigration-court hearing was set for April of 2028, which allowed him to remain in the country until then.  Id., ¶ 65.  Six months after he first arrived, he also applied for Temporary Protected Status.  Id., ¶ 66.  In the meantime, Rengel settled into his new life in Irving, Texas, where he worked as a barber and lived with his girlfriend and her daughter.  Id., ¶¶ 65–68.

Nearly two years later, on March 13, 2025, Plaintiff was detained by immigration officers at his apartment complex in Irving.  Id., ¶¶ 69–71.  They ordered him to display his tattoos, which include a barbershop and tiger, as well as the names of his mother and daughter.  Id., ¶ 71.  The officers determined that Rengel's tattoos indicated affiliation with Tren de Aragua, which he denied, and then took him into custody.  Id.  He and all other Venezuelans detained were then given the option of appearing before a judge or being deported to Venezuela.  Id., ¶ 72.  Plaintiff requested a hearing.  Id.

But he did not get one.  Instead, officers photographed his tattoos and then transferred him to a detention center in south Texas on March 14 — the same day that the Proclamation was secretly issued.  Id., ¶¶ 72–74.  The next morning, Rengel was told that he would be deported to Venezuela.  Id., ¶ 75.  He was then handcuffed, shackled, and loaded onto a bus to Harlingen, Texas.  Id., ¶ 76.  Upon arrival, Plaintiff was ordered onto a plane that he believed was bound for Venezuela, as the immigration officials had told him.  Id., ¶¶ 75, 78.  Once the plane touched down, Rengel found himself instead in San Salvador.  Id., ¶ 79.  He and other detainees protested to United States officials on the plane that they would not disembark because they were not in their home country.  Id., ¶¶ 79–80.  In response, those officials directed Salvadoran officials to board the plane and authorized them to strike the detainees and drag off those who resisted.  Id.,

¶ 80.  Plaintiff and his companions were then transferred to CECOT, where he was kept for four months.  Id., ¶¶ 82, 115.

During his time in CECOT, Rengel suffered numerous beatings at the hands of the guards, who told him that he would remain there for a minimum of ninety years.  Id., ¶¶ 116–18.  He was kept in sordid conditions and denied requested medical care.  Id., ¶¶ 120–22.  Plaintiff also witnessed a fellow detainee receive no medical assistance after violently convulsing and ultimately passing out in an acute diabetic episode.  Id., ¶ 123.

Seeking relief for his sufferings, Rengel, who currently lives in Venezuela, filed suit in this Court on March 25, 2026.  He asserts four claims against the United States under the Federal Tort Claims Act: negligence, intentional infliction of emotional distress, abuse of process, and false imprisonment.  Id., ¶¶ 141–62.  He requests money damages as well as a declaratory judgment that the Government's actions violated his rights.  Id., ¶ 163.  The United States now moves to dismiss for lack of venue.  See ECF No. 19 (MTD).

## II.    Legal Standard

"Venue as to [P]laintiff's Federal Tort Claims Act claim is governed by 28 U.S.C. § 1402(b), the general venue statute governing suits in which the United States is a defendant."  Bartel v. FAA, 617 F. Supp. 190, 198 (D.D.C. 1985).  Under that provision, FTCA suits "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."  28 U.S.C. § 1402(b).  Motions to dismiss for improper venue are governed by Federal Rule of Civil Procedure 12(b)(3).

"In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor."  Pendleton v.

Mukasey, 552 F. Supp. 2d 14, 17 (D.D.C. 2008) (internal quotation marks and citation omitted). "The Court, however, need not accept the plaintiff's legal conclusions as true, and may consider material outside the pleadings, including undisputed facts evidenced in the record to determine whether" venue is proper. Braun v. U.S. Dep't of the Interior, 288 F. Supp. 3d 293, 298 (D.D.C. 2018) (internal quotation marks and citation omitted). Given that it is a plaintiff's obligation to bring the action in an appropriate district, when the defendant objects to venue, the plaintiff "bears the burden of establishing that venue is proper." Ellis-Smith v. Sec. of Army, 793 F. Supp. 2d 173, 175 (D.D.C. 2011) (internal quotation marks and citation omitted); see 14D Wright & Miller's Federal Practice & Procedure § 3826 (4th ed. 2018).

When the propriety of the plaintiff's choice of venue turns on disputed questions of fact, the court may order discovery. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Motions for venue discovery are subject to the same legal standards as motions for jurisdictional discovery, Delta Sigma Theta Sorority, Inc. v. Bivins, 215 F. Supp. 3d 12, 15–16 (D.D.C. 2013), and the court "has broad discretion" in determining how best to resolve such motions. Hussain v. Nicholson, 435 F.3d 359, 363 (D.C. Cir. 2006). A plaintiff requesting venue-related discovery must "demonstrate[] that it can supplement its jurisdictional allegations through discovery" with "new, relevant information" demonstrating that venue would be proper. Shaheen v. Smith, 994 F. Supp. 2d 77, 89 (D.D.C. 2013) (quoting GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000)).

When a plaintiff brings suit in an improper venue, the district court "shall dismiss [the case], or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Although the decision to transfer or dismiss is committed to the district court's discretion, Naartex Consulting Corp. v. Watt, 722 F.2d 779, 789

6

(D.C. Cir. 1983), the interest of justice generally counsels in favor of transferring a case to the appropriate judicial district where venue is proper. Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466–67 (1962).

**III.   Analysis**

The Court first considers whether Plaintiff has established that venue is proper in this district before separately assessing the propriety of venue-related discovery and transfer.

   A.      Venue

Venue for any FTCA claim lies only in the judicial district where the plaintiff "resides" or where the "act or omission complained of occurred." 28 U.S.C. § 1402(b). It is undisputed that Rengel currently resides in Venezuela, not the District of Columbia. See Compl., ¶¶ 125, 127; MTD at 3. Venue is thus proper here only if the allegedly tortious conduct "occurred" here. Plaintiff hangs his venue hat on his IIED and negligence counts, contending that the operative conduct underlying those claims occurred in this district, see ECF No. 21 (MTD Opp.) at 9–11, and that venue therefore lies "over the entire case" based on a pendent-venue theory. Id. at 14–15 (citing Beattie v. United States, 756 F.2d 91, 101 (D.C. Cir. 1984)).

"Under the prevailing interpretation of section 1402(b), venue is proper in the District of Columbia if sufficient activities giving rise to plaintiff's cause of action took place here." Gill v. United States, 415 F. Supp. 3d 127, 142 (D.D.C. 2019) (citation omitted). The key question is whether a "substantial portion" of the acts with "operative significance" in the case — here, the alleged tortious conduct — can be placed within this district. Lamont v. Haig, 590 F.2d 1124, 1134 (D.C. Cir. 1978) (interpreting similar phrase "in which the claim arose" in prior version of 28 U.S.C. § 1391(b)); see, e.g., Hahn v. United States, 457 F. Supp. 2d 27, 29 (D.D.C. 2006)

(applying Lamont's reasoning to § 1402(b)); Williams v. United States, 932 F. Supp. 357, 363 (D.D.C. 1996) (same).

For FTCA venue purposes, when an individual acts in one district but "specifically" directs his conduct to another district, "the act 'occurs' in the jurisdiction where its effects are directed." Reuber v. United States, 750 F.2d 1039, 1047 (D.C. Cir. 1985), abrogation on other grounds recognized by, Kauffman v. Anglo-Am. Sch. of Sofia, 28 F.3d 1223 (D.C. Cir. 1994). Consistent with that principle, numerous courts in this district have found venue improper here where federal officials in Washington engaged in conduct directed at other districts, producing intended effects there. See Sanchez ex rel. Rivera-Sanchez v. United States, 600 F. Supp. 2d 19, 21, 23 (D.D.C. 2009) (concluding that even if allegedly tortious orders came from "various government officials and agencies" in D.C., "venue is improper in this district" because orders were "directed at the Puerto Rican island of Vieques"); Patel v. Phillips, 933 F. Supp. 2d 153, 165 (D.D.C. 2013) (same where "defendants working at the BOP's Washington, D.C.[,] office" "made the decision" to transfer prisoner because decision was directed at out-of-district prison); Attkisson v. Holder, 241 F. Supp. 3d 207, 213 (D.D.C. 2017) (same where tortious conduct "originated" from agency's "headquarters in the District of Columbia" but was "directed at the [plaintiffs'] home in Virginia"); but see Franz v. United States, 591 F. Supp. 374, 378 (D.D.C. 1984) (pre-Reuber case finding venue proper in similar circumstance).

Applying those principles, the Court must determine whether the outcome should be different here, where Rengel alleges that officials in D.C. made the critical decisions concerning his deportation and treatment, which ultimately occurred outside this district. The question is undoubtedly close, but the Court ultimately concludes that it should not. To begin with his IIED claim, Plaintiff alleges that Administration officials committed that tort by "intentionally

8

direct[ing] and implement[ing]" a scheme designed to deprive him of constitutional due process by shipping him out of Texas without a hearing and to inflict physical and emotional pain upon him by removing him to CECOT. See Compl., ¶ 149. That allegation does not suffice to establish venue. True, the high-ranking federal officials who designed and directed the implementation of the Proclamation were physically located in D.C. See MTD Opp. at 8–9. But each directive was aimed at Texas, the staging ground for the Government's AEA-based removals. See J.G.G. v. Trump, 778 F. Supp. 3d 24, 31 (D.D.C. 2025). In the months leading up to the Proclamation, federal officials ordered that purported members of Tren de Aragua be transferred to a facility near Harlingen, not far from the Mexico border. Id.; see Compl., ¶ 58. Those officials likewise directed that planes be staged at an airport in Harlingen, where they would await the order that the detainees be jetted out of the country. See J.G.G., 778 F. Supp. 3d at 31; Compl., ¶¶ 15, 58. Bove, meanwhile, directed that officials needed to do everything in their power to ensure that those planes took off from Texas. See Compl., ¶¶ 90–91. True to plan, when Proclamation day came, federal officials ordered that the detainees — among them Rengel — be loaded onto buses from their South Texas detention facility, carted to the Harlingen airport, and hustled onto the awaiting planes. See J.G.G., 778 F. Supp. 3d at 31; Compl., ¶¶ 76–78. Texas was thus plainly the target of each of the major directives issued to implement the Proclamation, and it is "where the foreseeable harm" to Rengel and his companions would occur. See Reuber, 750 F.2d at 1047. The Executive Branch officials' conduct therefore "occurred" for FTCA venue purposes in Texas.

Plaintiff also alleges that "[f]ederal officials and law enforcement officers" engaged in IIED by forcing him to watch his fellow detainees suffer abuse "on the plane and on the tarmac, as he awaited his imprisonment in CECOT," and by sending him to CECOT, where he

9

"endure[d] physical and psychological torture."  Compl., ¶ 150.  Those allegations even more clearly demonstrate that the underlying conduct occurred either in San Salvador or somewhere in the skies between Texas and El Salvador — but certainly not in Washington.

Rengel's attempt to hang venue on his negligence claim founders for similar reasons.  He alleges that the "[l]aw enforcement officers who detained and removed [him]," as well as federal officials in Washington who "direct[ed] and supervise[d]" those decisions, breached a duty of care that they owed to anyone "in government custody" when they removed him without process and sent him to a "known high-risk environment" in CECOT.  Id., ¶¶ 144–145.  But the operative events underlying that claim also occurred in Texas.  Immigration officers apprehended Plaintiff based on an examination of his tattoos at his home in Irving and then detained him at a detention center in "south Texas."  Id., ¶¶ 69–73.  Likewise, immigration officials removed Plaintiff from the United States at the airport in Harlingen.  Id., ¶¶ 73–76.  As established above, D.C.-based officials who directed and supervised Plaintiff's detention and removal did so with the intent that he be detained and removed from where he was located — Texas.  See Reuber, 750 F.2d at 1047.  Venue is consequently improper in this district.

Resisting that conclusion, Rengel contends that the D.C.-based conduct underlying his IIED and negligence claims — which includes high-ranking Executive Branch officials' creating, directing, and ordering the implementation of an "unconstitutional immigration scheme" — was substantial and more than sufficient to justify venue here.  See MTD Opp. at 7–14.  He maintains that Reuber does not doom that assertion because the case applies only when the "conduct is aimed at an identifiable place or target."  Id. at 17.  The conduct at issue here, he argues, was "nationwide in design and effect, applicable to Venezuelan nationals wherever they

were located."  Id. at 10; see also id. at 20 ("Plaintiff does not allege conduct in D.C. targeting a specific individual in a specific state.").

Even assuming Reuber's effects-based test is narrow and applies only in the limited circumstance where conduct is "directed specifically" at another district, Plaintiff's argument fails to persuade.  See 750 F.2d at 1047.  His theory of venue works only if one disregards "the relevant activities actually giving rise to" his tort claims — conduct that was tortious specifically as to him — and construes the relevant conduct as the federal policy writ large.  Attkisson, 241 F. Supp. 3d at 213.  The FTCA, however, is not a means for litigants to challenge federal policy in the abstract.  It authorizes suit against the United States only for "act[s] or omission[s]" that a "private person" could be liable for in tort.  See 28 U.S.C. § 1346(b).  The relevant question for FTCA venue purposes is thus not where the Proclamation was intended to have effect, but rather where the acts implementing the Proclamation were directed.  So properly construed, the relevant conduct at issue was plainly aimed at an identifiable location: Texas, where Plaintiff and other Venezuelans deemed members of Tren de Aragua were detained and ultimately removed.

Rengel also argues in passing that he prevails even under Reuber's effects test because he alleges not just a "nationwide policy crafted, coordinated and directed from D.C.," but also "the unlawful defiance of this Court's order" — the effects of which he says were felt in this district. See MTD Opp. at 21–22.  Yet Plaintiff did not bring a tort claim for the D.C.-based officials' defiance of this Court's order.  Cf. Compl., ¶¶ 154–55 (alleging abuse-of-process claims for conduct of "[l]aw enforcement officers" in Texas who "utilize[d] the Proclamation to deny Plaintiff all due process, including in defiance of a court order").  In any event, even if he had, the relevant question would have been where Plaintiff — not this Court — felt the effects of that conduct.  That location would have been Texas or El Salvador, where Government officials

authorized Salvadoran officials to take Plaintiff and his fellow detainees to CECOT, despite this Court's order that the United States should not relinquish custody of them. See J.G.G., 778 F. Supp. 3d at 37–38.

Finally, Plaintiff suggests that venue is proper in Washington because records and witnesses supporting his allegations would be found here. See MTD Opp. at 22. But the FTCA's venue provision makes venue turn exclusively on where the plaintiff resides or where the act occurred. Reuber, 750 F.2d at 1048–49 (emphasizing word "only" in statute). As such, the Court declines to weigh the accessibility to records and witnesses, as well as other matters of convenience or judicial economy, in determining the propriety of venue in this district.

\*       \*       \*

The Court acknowledges that Plaintiff's claims against the United States implicate federal policy choices made in D.C. and directives issued from this city. But many such claims do, and under the law, that alone is insufficient to establish that venue is proper here. Cf. Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993) (warning courts in this district to examine challenges to venue "carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia"). It is worth noting that this conclusion should not unduly prejudice Plaintiff. This is because, had venue been proper here as to the negligence and IIED claims, it is unlikely that this would have established venue over the entire case. See Reuber, 750 F.2d at 1048–49 ("Congress has specified the district in which the act occurred as the 'only' district . . . where a claim may be brought, and thereby created a strong negative presumption against courts finding discretionary pendent venue elsewhere.") (quoting 28 U.S.C. § 1402(b)); Compl., ¶¶ 151–62 (bringing abuse-of-process and false-imprisonment claims for conduct of "[l]aw enforcement officers" in Texas).

B.  Venue-Related Discovery

To fend off dismissal or transfer, Plaintiff alternatively requests that this Court grant venue-related discovery.  See MTD Opp. at 22–25; ECF No. 22 (Mot. for Venue Disc.). Plaintiff, however, has not demonstrated that discovery would lead to "new, relevant information," Shaheen, 994 F. Supp. 2d at 89, that would alter the Court's conclusion that "the gravamen of the acts or omissions complained of . . . occurred [elsewhere]." Sanchez, 600 F. Supp. 2d at 23.

Plaintiff says that discovery would allow him to identify "what discrete acts were taken by federal officials in D.C. to abuse procedural safeguards and disregard normal immigration law procedures in the hasty implementation of the Alien Enemies Act Proclamation," and to determine whether the officials identified in the Complaint were the "primary, active drivers" of that initiative.  See Mot. for Venue Disc. at 6; MTD Opp. at 23.  The Court has already assumed — as it must based on Plaintiff's allegations — that named, high-ranking D.C. officials directed the implementation of the Proclamation and were the prime drivers behind it.  Further information concerning their discrete conduct would not alter the Court's determination that those officials directed their orders to Texas, where the Proclamation was implemented as to Rengel, and that their conduct thus "occurred" in Texas.  See Reuber, 750 F.2d at 1047.  Nor would it cleanse the core issue that a nationwide policy alone — detached from implementing, tortious conduct — cannot be attacked under the FTCA.

Plaintiff also contends that discovery would assist him in determining if the "'intended effects' of the Proclamation" were in fact directed only at Texas, rather than nationwide.  See Mot. for Venue Disc. at 6.  For the reasons already explained, any further factual development on that score would not change the Court's calculus either.  Under the FTCA, Rengel is necessarily

13

bringing tort claims for specific wrongs that he personally experienced, not to challenge federal policy in the abstract. And he does not allege that venue discovery would reveal any information suggesting that the D.C.-based officials intended that their orders would affect him anywhere but where he was located at the time that he was detained and removed — the Southern District of Texas. The Court consequently denies the request for venue-related discovery.

C.    Transfer

As detailed above, the "act[s] or omission[s]" underlying Plaintiff's IIED and negligence claims "occurred" in the Southern District of Texas. See 28 U.S.C. § 1402(b). In addition, Plaintiff effectively concedes that the abuse-of-process and false-imprisonment claims arise from law-enforcement conduct that also occurred there. See Compl., ¶¶ 151–162. Indeed, neither party disputes that "this case could have been brought in the Southern District of Texas." MTD Opp. at 26; ECF No. 23 (Reply) at 9.

The only remaining question, then, is whether to transfer the case there or dismiss it outright. The Government asks for the latter. See Reply at 8–9. The Court, however, declines the invitation. "[D]ismissal may be appropriate where there are obvious substantive problems with the plaintiff's claims," or "if no court would have subject matter jurisdiction over a claim." Laukus v. United States, 691 F. Supp. 2d 119, 127 (D.D.C. 2010). The Government advances neither argument here. See MTD at 4 n.4; Reply at 8–9. This Court will thus exercise its discretion to transfer the case in the interest of justice. See Nat'l Wildlife Fed'n v. Browner, 237 F.3d 670, 674 (D.C. Cir. 2001) ("[T]he standard remedy for improper venue is to transfer the case to the proper court rather than dismissing it.").

14

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying the Motion to Dismiss, denying Plaintiff's Motion for venue-related discovery, and transferring the case to the Southern District of Texas.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  August 3, 2026

15